[Crim. No. 3096.   Second Appellate District, Division One.—June 3, 1938.]

THE PEOPLE, Respondent, v. MILFRED R. YANT, Appellant.

Eugene L. Wolver, David Coleman and Louis Miller for Appellant.

U. S. Webb, Attorney-General, R. S. McLaughlin, Deputy Attorney-General, Buron Fitts, District Attorney, and Herman L. Arterberry, A. H. Van Cott and Jere J. Sullivan, Deputies District Attorney, for Respondent.

WHITE, J.—In an indictment returned by the grand jury, appellant, Milfred R. Yant, and the above-named codefendants [Robert A. Randall, Robert E. Tabor, Earl A. Libby, Aubrey Pereira, Jack Freeman, H. Martin and William Burns] were charged in count I, with the crime of conspiracy to violate the Corporate Securities Act and to commit grand theft. In eleven of the remaining twenty counts they were charged with the substantive offenses of grand theft, and in nine counts with as many violations of the Corporate Securities Act. Appellant admitted that he had suffered a prior felony conviction as charged against him. Defendant William Burns was not apprehended. Upon the entry of not guilty pleas by the remaining defendants as to all counts of the indictment, the cause proceeded to trial before a jury, during the progress of which trial defendant Jack Freeman withdrew his plea of not guilty as to count III, whereupon as to him the remaining counts of the indictment were dismissed. Upon the completion of the People's case, the defense offered no testimony and rested. The jury returned verdicts finding appellant Yant guilty on count I, charging conspiracy to violate the Corporate Securities Act and to commit grand theft, guilty on the nine counts of the indictment charging violations of the Corporate Securities Act, and not guilty as to the counts charging grand theft. A codefendant, Earl A. Libby, was likewise convicted and acquitted on the same counts as appellant Yant. Defendant Libby was placed on probation and does not appeal. From the several judgments pronounced against him and from the order denying his motion for a new trial, defendant Yant prosecutes this appeal.

The first contention advanced by appellant is that the wording of the indictment as to count I is wholly insufficient to charge any offense other than the conspiracy to violate the Corporate Securities Act, for the reason that as to the charge of conspiracy to commit the crime of grand theft, the pleading is destitute of any allegation as to the value of the property alleged to have been the subject of the proposed theft or the narration of any acts which would constitute grand theft. Appellant's claim in this regard cannot be sustained, for the law is well settled that under the provisions of section 182 of the Penal Code an unlawful agreement to commit more than one crime may be alleged. The language of section 182 of the Penal

Code here in question is inclusive and elastic enough to permit the framing of an indictment charging conspiracy to do or commit any or all of the illegal acts referred to therein (*People* v. *MacPhee,* 26 Cal. App. 218, 220 [146 Pac. 522]); and to do all of the things enumerated in the different subdivisions of section 182 of the Penal Code amounts to a single offense only. (*People* v. *Johnson,* 22 Cal. App. 362, 364 [134 Pac. 339]; *People* v. *Welch,* 89 Cal. App. 18 [264 Pac. 324]; *People* v. *Gilbert, ante,* p. 1 [78 Pac. (2d) 770].) ■ As to the uncertainty charged with reference to the grand theft allegations, the answer is that the purpose of an indictment or information is to inform the accused of the charge which he must meet at the trial. Under our system of procedure in criminal cases, as a part of the accusatory procedure, the law now provides that in every case the accused is entitled to a copy of the testimony given before the grand jury or the committing magistrate, as the case may be. (Secs. 870, 925, Pen. Code.) The former requirement that a pleading must set forth the particular circumstances of the offense charged, as now amended declares that it shall be sufficient if it charges "in any words sufficient to give the accused notice of the offense of which he is accused". (Sec. 952, Pen. Code.) The appellant herein was entitled simply to notice of the offense of which he was charged, but not to the particular circumstances thereof, such details being furnished him by the transcript of the testimony upon which the indictment was founded. (*People* v. *Beesly,* 119 Cal. App. 82 [6 Pac. (2d) 114, 970]; *People* v. *Gilbert, supra*; sec. 951, Pen. Code.) A mere reading of the issues presented in the case of *People* v. *Barnard,* 63 Cal. App. 562, 571 [219 Pac. 756], cited by appellant, readily indicates that it is easily distinguishable from the instant case. In the conspiracy charge it was of course required, and the indictment did allege certain overt acts.

■ Concerning the alleged uncertainty in the indictment, it might here be noted that no demurrer was interposed in this case. We have, however, given consideration to the claim, made for the first time in this court, notwithstanding that when a party accused fails to demur upon any of the grounds mentioned in section 1004 of the Penal Code, the objection is to be deemed waived and cannot be presented for the first time on appeal. (*People* v. *McKim,* 84 Cal. App. 663 [258 Pac. 457].)

■ Appellant next complains that he was not legally or properly sentenced for the offense charged in count I, for the reason that the offense of conspiracy to violate the Corporate Securities Act is punishable by a term of imprisonment not exceeding five years, while the maximum penalty for the crime of conspiracy to commit the offense of grand theft is ten years. This claim is without merit, because the conspiracy, that is, the unlawful agreement or combination, is the crime; and that is one, however diverse its objects. As to the difficulty which appellant asserts may arise in determining the period of imprisonment that may be fixed as punishment for the crime, that is a question for the board of prison terms and paroles to determine, and not the trial court. Both the offenses charged as being the object of the conspiracy are felonies, and the trial court having designated a state prison as the place of confinement, the question of determining the extent of the sentence is left with the aforesaid prison board. As was said in the case of *People* v. *Welch, supra,* page 24, "it is quite possible that the query will never become acute, for the reason that the prison board may see fit to fix a period of incarceration within the maximum provided for the least serious offense specified as the object of conspiracy, in which event appellants would have no legal cause for complaint".

■ The acquittal of appellant on the eleven counts charging him with the substantive offenses of grand theft, and which counts were also pleaded as overt acts in count I charging conspiracy, did not operate to acquit him of the conspiracy count, because the substantive offenses charged did not constitute the only overt acts pleaded in the conspiracy count; and therefore the innocence of appellant of the substantive offenses of grand theft did not constitute a determination that no criminal conspiracy existed. ■ It is only when the substantive offense charged is alleged as a single entity to be the only overt act in furtherance of the conspiracy that an acquittal of the substantive offense operates as an acquittal of the conspiracy charge based solely thereon. Where, as in the instant case, the portion of the count charging conspiracy remaining unadjudicated is sufficient to constitute criminal conspiracy, a conviction on the latter charge will stand (*In re Johnson,* 3 Cal. (2d) 32, 35 [43 Pac. (2d) 541]) ; and this is true although some of the overt acts charged in the conspiracy count were not in themselves of a criminal nature, because if such innocent acts were done and

performed in preparation to carry out the conspiracy, they are sufficient overt acts within the meaning of the law of this state. (*People* v. *George*, 74 Cal. App. 440, 451, 458 [241 Pac. 97]; *People* v. *Stevens*, 78 Cal. App. 395, 405 [248 Pac. 696]; *People* v. *Gilbert, supra.*)

Appellant next contends that as to all counts upon which he was convicted, the evidence is insufficient to justify or sustain said convictions. For a proper consideration of this claim it is necessary to present a statement of the factual background of the activities of appellant and his associates, as the same was developed by the evidence produced at the trial. On April 27, 1935, the appellant entered into a ninety-day sublease agreement with the Nile Oil Company, Ltd., a corporation, covering certain oil lands near Newhall, California, on which there were four wells. On April 30, 1935, the appellant Yant and his codefendants Earl A. Libby and Aubrey Pereira organized a corporation under the laws of California, the purpose of which, among other things, was to engage in the oil, petroleum, mineral and gas business under the corporate name of Yant Petroleum Corporation, and filed articles of incorporation with the Secretary of State on May 1, 1935. The corporation commissioner issued a permit to the corporation to sell not to exceed 1,000 shares of its stock for cash to its officers, appellant Yant, and codefendants Libby and Pereira, who were respectively president, secretary-treasurer and vice-president. There is no evidence that authority was given to sell to the public or that any sales of stock were made to the public, from which it necessarily follows that the Yant Petroleum Corporation was what is commonly known as a "closed corporation".

On May 20, 1935, appellant Yant entered into another oil and gas sublease with the Nile Oil Company, Ltd., covering the aforesaid and additional lands, with added obligations in said sublease set forth. On July 24, 1935, the appellant Yant assigned and transferred this sublease to the Yant Petroleum Corporation. On September 1, 1935, another and additional agreement was entered into between the Nile Oil Company, Ltd., and the Yant Petroleum Corporation, whereby it was agreed that the latter would purchase the original oil and gas lease mentioned and described in the above-named subleases. It further appears that appellant Yant entered into an option to purchase certain real properties from Thomas F. Frew, Jr.,

and wife on June 15, 1935, covering approximately 300 acres of land near Newhall at the stipulated price of $50 per acre, and on February 15, 1936, appellant entered into an option to purchase an additional small tract of land near Newhall from Thomas F. Frew, Jr., and Walter Park, at the agreed price of $1,000 for each and every 1/12th acre. On July 8, 1936, a novation, disclaimer, release and waiver was entered into between Mr. and Mrs. Frew and appellant, wherein the Frews released all right, title and interest to the oil and gas rights on the above-described land to appellant.

With reference to the subsequent activities and negotiations carried on by appellant, it will not be necessary to set forth the testimony of each of the witnesses with reference to the individual counts, because the testimony of the witness Dr. H. B. Bryson with reference to his contact and business relations with appellant will serve to illustrate the conduct and activities of appellant. Epitomized, such testimony indicates that on December 13, 1935, Dr. Bryson, who was 79 years of age, met the defendants Martin and Pereira, who took him and a Mrs. Emma K. Lemley out to the property at Newhall, where he was introduced by defendant Martin to the appellant. At this time the doctor had a conversation with appellant Yant, who informed him that appellant owned 417 acres and had options on additional acreage, and was selling this property at $1950 per acre, but that he would sell any part of an acre in small fractions *pro rata*. Appellant also stated that there were four wells now producing there, and that from these wells appellant paid interest on his community leases, which leases will be later referred to. At this time Dr. Bryson took an option to purchase one acre, and signed an order for a deed in the presence of appellant, whereupon appellant directed defendant Martin, who was one of his salesmen, to prepare the option and order. On January 10, 1936, Dr. Bryson went to the office of appellant, where he met the defendant Libby, who was one of the officers of Yant Petroleum Corporation, and Dr. Bryson paid to defendant Libby the sum of $505, receiving a receipt from Libby therefor, and also obtaining from defendant Libby a grant deed executed by appellant Yant conveying one acre of land. Dr. Bryson thereupon executed a community oil and gas lease of said land to the Yant Petroleum Corporation. In this connection, it might here be noted that the evidence indicates in all of the counts that the purchasers of land inter-

ests were advised of the oil possibilities and were requested to and did execute community leases. On February 10, 1936, Dr. Bryson again purchased another one-half acre of land, following a conversation with appellant and defendant Martin, at which time appellant stated that he had a very choice half-acre very close to the producing wells and the well he was then drilling, and pointed out the location of this very choice half-acre. Dr. Bryson paid $300 down on this half-acre, and the balance was to be paid at the rate of $50 per month. A deed executed by appellant for this half-acre was delivered to the doctor, who thereupon executed a community oil and gas lease of the land in question to the Yant Petroleum Corporation. On July 18, 1936, Dr. Bryson purchased another half-acre from the appellant adjoining the above half-acre, for which he received a grant deed executed by appellant and upon which land the doctor again executed an oil and gas lease.

Shortly thereafter, Dr. Bryson was called upon by a man named Burns (who was named as a defendant in this action, but who was never apprehended), with whom the doctor had a conversation. Following this conversation, the doctor contacted appellant and defendant Libby at their office in Los Angeles, telling them that Burns had stated to him that he represented the Consolidated Oil Royalties Company of Oklahoma, and was authorized by his company to purchase thirty acres of the Yant Petroleum Corporation's holdings at $5,000 per acre; and that Burns said he obtained Dr. Bryson's name from a former employee of Yant Petroleum Corporation. Following this conversation wherein Dr. Bryson told Yant and Libby of his conversation with Burns, the doctor purchased an additional three acres from appellant, giving to the latter in payment for this acreage certain oil bonds aggregating $5,000 and a promissory note in the sum of $1950. Following the receipt of a deed to this last-named property, executed by Yant the doctor in turn gave an oil and gas lease on the land to Yant Petroleum Corporation. It might here be noted that Burns never again appeared.

On August 8, 1936, appellant Yant sent a form letter to all land purchasers, advising them that he had withdrawn his property from the market because well No. 5 had "blown in" and the property was too valuable to sell to anyone; and in this letter appellant also advised the addressees that he had dismissed all of his salesmen. A few months later, on

November 6, 1936, defendant Libby sent a form letter to all purchasers, signed by him as secretary-treasurer of the Yant Petroleum Corporation, advising them that well No. 5 had been completed, was then in production, and that the corporation was drilling well No. 6.

The oil and gas leases executed by Dr. Bryson and others mentioned in the respective counts to the Yant Petroleum Corporation, among other things provided for monthly rentals to be paid to the landowners in the sum of $16.20 per acre or fraction thereof, and also monthly payments of a specified fraction of the net proceeds of the sale of oil by the lessee. These rentals were paid by Yant Petroleum Corporation until September, 1936, when they ceased. On the back of the ''order for deed'' which formed a part of each transaction, there was printed a report of the real estate commissioner of California, containing among other things, this language: ''The subdivider informs this Division that the Yant Petroleum Corporation will lease these lots from the purchaser for a period of twenty years, paying them a guaranteed minimum rental of $19.50 per year per lot.'' The deeds which passed from appellant to the various grantees mentioned in the counts upon which appellant was convicted convey parcels of land varying from a 7/1000ths part of an acre to one acre.

In view of the recent decisions in the cases of *People* v. *Jackson,* 24 Cal. App. (2d) 182 [74 Pac. (2d) 1085], and *People* v. *Daniels,* 25 Cal. App. (2d) 64 [76 Pac. (2d) 556], it would extend this opinion to undue length were we to discuss in detail the claim here made that the various instruments executed by appellant and introduced in evidence as aforesaid were deeds whereby interests in real property were transferred, and that they do not come within the definition of a ''security'' as that term is defined in the California Corporate Securities Act, and that appellant therefore could not be successfully prosecuted for issuing the same. It is evident from the foregoing testimony that the intent and purpose of both appellant as grantor and the grantee in each instrument was to sell and purchase an interest in oil that might be produced upon the land, for representations were made that the land would be leased by the Yant Petroleum Corporation for a stated monthly rental and that the purchaser, who became lessor in the community lease, would receive a *pro rata* share in any oil production. In other words, it was

never intended in the transactions here in question that the purchasers of the land would receive any returns from their money on account of anything done by them, but on the contrary, the only returns to the investors would be on account of something done by others, to wit, the lessees under the community leases; and we are constrained to the opinion that the transactions constituting the respective counts wherein appellant was convicted of conspiracy to violate, and of violations of, the Corporate Securities Act, come within the scope of the statute. (*People* v. *Steele*, 2 Cal. App. (2d) 370, 374 [36 Pac. (2d) 40].) Looking through the mere form of the instruments to the facts and circumstances which surrounded their execution, we have no hesitancy in arriving at this conclusion. It should be and is an established principle of law that the substance and not the mere form of transactions constitutes the proper test for determining their real character. If this were not true, it would be comparatively simple to circumvent by sham the provisions of statutes framed for the protection of the public. This the law does not permit. (*People* v. *Ratliff*, 131 Cal. App. 763, 772 [22 Pac. (2d) 245]; *People* v. *Reese*, 136 Cal. App. 657, 672 [29 Pac. (2d) 450].) The evidence clearly shows that appellant and his codefendants were engaged in the business of selling securities in the form of certificates of interest in an oil title and lease, without first having applied for and secured from the commissioner of corporations of this state a permit authorizing them so to do.

Concerning the conspiracy count, numbered I in the indictment, and appellant's claim that there is no evidence in the record of any agreement between appellant and the coconspirator Libby, who was also convicted, that shows the formation of a conspiracy, we concede the soundness of appellant's claim, as a principle of law, that mere association is not sufficient to show a conspiracy. However, in the case before us there was more than mere association; on the contrary, there was considerable active cooperation between appellant and his codefendant Libby. For instance, both were incorporators of the Yant Petroleum Corporation; in connection with their dealings with Dr. Bryson both appellant and Libby occupied the same offices; Dr. Bryson paid both appellant and Libby various sums of money in connection with the transactions mentioned in the conspiracy count, and received receipts from each of them at various times; while

the doctor also had several conversations with appellant and Libby pertaining to the property sold to him. The evidence necessary to prove a conspiracy may, and in many instances invariably must, be established by circumstantial evidence.

It is not often that the direct fact of an unlawful agreement which is the essence of a conspiracy can be proved otherwise than by the establishment of independent facts bearing upon the common design; and the question as to the existence of the conspiracy being one of fact, it is sufficient if the circumstances proved satisfy the jury, leaving the weight and sufficiency of the evidence to the triers of the questions of fact. (*People* v. *Sampsell,* 104 Cal. App. 431, 439 [286 Pac. 434].) It requires no citation of authority for the statement that before this court on appeal can set aside the decision or the verdict of the jury, which has been approved by the trial judge in the denial of a motion for a new trial, it must be made clearly to appear that upon no hypothesis whatever is there substantial evidence sufficient to support the verdict of the jury and the conclusion of the trial court. None of the evidence introduced by the prosecution was in any wise contradicted by appellant or his codefendants. Appellant did not take the stand to deny any of the accusatory evidence submitted by the prosecution.

Appellant next contends that the trial court fell into error in admitting certain evidence as to the codefendant Burns, who was not upon trial because he had not been apprehended. Burns, it will be remembered, is the man who appeared with an offer to buy the land from the purchasers thereof, with the proviso, however, that they would have to obtain more land than they then owned, for which Burns would pay a price that would net such purchasers a large profit. Reference to the record indicates that the trial court did not permit the witnesses to testify as to their conversations with Burns, but did permit them to testify as to what they said to appellant concerning their conversations with Burns. As an example of the type of testimony which was admitted, we might refer to the witness Viola Coates, who testified that after Burns left she went to the office of appellant, telling him that Burns had called and said he represented an Oklahoma oil company, and that he offered $10,000 for two acres; that she asked appellant if he knew Burns, and the former

said he did. She then informed appellant that she told Burns she did not have two acres, to which appellant replied, "I had you on our records for two acres". She later went back to see appellant, telling him she had been tricked and fooled into buying this additional property, and demanding her money back; appellant did not deny this last statement, but said he would return her money, which he never did. Thus we see that the testimony admitted was not as to conversations had with Burns outside the presence of defendants, but consisted of statements made by Burns, who was a conspirator, to the witness and which were related by the latter to the conspirator and appellant Yant. This was proper.

It is next contended by appellant that the court erred in permitting the deputy district attorney over objections of defendants to read to the jury the testimony of the coconspirators Tabor and Pereira given before the grand jury without advising the jury that such testimony, having been given subsequent to the termination or frustration of the conspiracy, was not binding upon appellant or any of the coconspirators other than the declarants thereof. Following such objections, the court stated to the jury: "Now, in due time the court will give you instructions concerning the method by which you should consider and weigh the evidence in the case. So far as the charge of conspiracy is concerned, the court now instructs you that it is the law that after proof of a conspiracy the acts and declarations of a conspirator against his coconspirators relating to the conspiracy may be received into evidence. I state this to you without any implication from me or inference to be drawn from my statement that the crime of conspiracy has or has not been proved. In due time that problem will be presented to you for your determination under instructions to be subsequently given to you." This was an incorrect and erroneous statement of the law concerning the declarations of coconspirators made after the termination or frustration of the conspiracy. However, at the close of the case, the court gave the following instructions:

"The acts and declarations of one defendant, committed or spoken after the commission of the alleged offense, not in the presence of his codefendants, are not evidence against the defendants not present."

This was followed by the following decisive instruction:

"You are instructed that the testimony of defendants Tabor and Pereira before the grand jury cannot be considered by you as against any other defendant."

In the face of this positive and correct exposition of the law, having in mind section 4½ of article VI of the Constitution, and after an examination of the entire cause, we cannot say that the error complained of has resulted in a miscarriage of justice. Remembering that neither appellant nor any of his coconspirators testified in their own behalf, and that their failure so to do and thereby explain or deny by their testimony any evidence against them may be considered by the court and jury, we have no hesitancy in saying that the record here does not present a case that is so evenly balanced in the scales of justice that the error complained of would be prejudicial to appellant. This is especially true in view of the court's final and proper instruction.

Appellant next complains of the refusal of the court to give certain instructions, and sets forth in his reply brief the instructions which he contends the court should have given. No complaint is made of the instructions that were given, but it is contended that certain instructions consonant with the theory of the defense were refused by the court. We have examined the instructions given, as well as those refused. This examination fortifies us in the view that the jury was correctly and properly instructed upon all issues presented by the indictment or raised by the evidence, and that the instructions requested by appellant and refused by the trial court were either erroneous and not justified by the issues or the evidence, or had been covered by other and correct instructions.

Lastly, appellant contends that the Corporate Securities Act is unconstitutional. The cases of *People* v. *Craven,* 219 Cal. 522 [27 Pac. (2d) 906], *Domestic & Foreign Pet. Corp. Ltd.* v. *Long,* 4 Cal. (2d) 547 [51 Pac. (2d) 73], *People* v. *Rubens,* 11 Cal. App. (2d) 576 [54 Pac. (2d) 98, 1107], and *People* v. *Leach,* 106 Cal. App. 442 [290 Pac. 131], have all held the Corporate Securities Act to be constitutional in the light of the facts before the court; while we have no hesitancy in saying that under the facts presented in the case before us the act is not unconstitutional. In answer to appellant's criticism of the act to the effect that it interferes with the right to acquire, possess and dispose of property, as guaranteed by article I, section 1, of the Constitution of this

state, and the Fourteenth Amendment to the Constitution of the United States, we might close this opinion with the following observation by the Supreme Court of the United States relative to the purposes of legislation of this character and of the evils it is designed to correct:

"It will be observed, therefore, that the law is a regulation of business, constrains conduct only to that end, the purpose being to protect the public against the imposition of unsubstantial schemes and the securities based upon them. Whatever prohibition there is, is a means to the same purpose, made necessary, it may be supposed, by the persistence of evil and its insidious forms and the experience of the inadequacy of penalties or other repressive measures. The name that is given to the law indicates the evil at which it is aimed, that is, to use the language of a cited case, 'speculative schemes which have no more basis than so many feet of "blue sky"'; or, as stated by counsel in another case, 'to stop the sale of stock of fly-by-night concerns, visionary oil wells, distant gold mines and other like fraudulent exploitations'. Even if the descriptions be regarded as rhetorical, the existence of evil is indicated, and a belief of its detriment; and we shall not pause to do more than state that the prevention of deception is within the competency of government and that the appreciation of the consequences of it is not open for our review." (*Hall* v. *Geiger-Jones Co.,* 242 U. S. 539, 550 [37 Sup. Ct. 217, 61 L. Ed. 480, Ann. Cas. 1917C, 643, L. R. A. 1917F, 514].) The defendant was fairly tried and justly convicted.

The judgments and the order denying the motion for a new trial are, and each of them is, affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 15, 1938, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 1, 1938.