[Crim. No. 2244.   First Dist., Div. One.   Feb. 16, 1943.]

THE  PEOPLE,  Respondent,  v.  LOUIS  BUCCHIERRE
et al., Appellants.

John B. Ehlen for Appellants.

Earl Warren, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

WARD, J.—Appeal from a judgment of conviction in a prosecution for conspiracy as defined in Penal Code, section 182, the object of the conspiracy being to violate the Employment Agency Act. The indictment contains the usual allegations of knowledge, confederation, agreement, etc., and then sets forth that in violation of section 1581 of the Labor Code the accused operated and conducted an employment agency without procuring a license therefor from the Labor Commissioner.

The first of four alleged overt acts is a fair sample of the asserted scheme or plan of operation. It is set forth in the indictment as follows: "And in pursuance of such conspiracy and to effect the object and purposes thereof, and between the 1st day of July 1941, and the 13th day of January 1942, to-wit: on or about the 15th day of July 1941, at the said City and County of San Francisco, State of California, defendant, Louis Bucchierre, proposed to one, Theodore Friend, that he and other persons could arrange to have said Theodore Friend accepted as a member of the Ship Painters Union, Local 961, and could thereafter obtain employment for him as a ship-painter in one of the various shipyards in or about the City and County of San Francisco, State of California in consideration of a fee or charge, in the sum of One Hundred and Eighty Five Dollars in lawful money of the United States of America which said One Hundred and Eighty Five Dollars was to be paid in installments of Twenty Five Dollars per week; that thereafter, towit: on or about 1st day of August 1941, the defendants, Louis Bucchierre and Joseph P. Cato, and each of them, did in fact arrange and obtain membership in the Ship-Painters Union, Local 961, for the said Theodore Friend, and thereafter, and on or about the 8th day of August 1941, the said defendants, and each of them, and divers other persons, whose names and numbers are to this Grand Jury now unknown, did ob-

tain for said Theodore Friend, employment as a ship-painter at the Bethlehem Shipbuilding Company in the said City and County of San Francisco, State of California, and that therefor and in consideration of the services performed by said defendants and each of them, and by divers other persons whose names and numbers are to this Grand Jury now unknown, the said Theodore Friend, paid to the said defendants, and each of them, the total sum of One Hundred and Eighty Five Dollars in lawful money of the United States of America.''

Appellant Cato and one Harry C. Vale were shop stewards at a local shipyard, and served upon the examining board of a local ship painters' union. Vale was appointed also to act as sergeant at arms for the union upon discovery that the delegated sergeant at arms was not a citizen. The duties of the examining board are to see that applications for membership are properly filled out and that the applicants have paid their initiation fees and dues. It is their further duty, after ascertaining the experience and ability of applicants as painters, to pass upon their eligibility, and in many instances they act as sponsors for them. When an applicant is dispatched for work he reports to the personnel department of the shipyard; ''he goes through the formality—they take his picture and his pertinent data regarding the fact of whether or not he is a citizen, and so forth, and then surrenders one of those slips to the shipyards, and they keep that as part of their permanent record. When he goes onto the actual job he meets the shop steward . . . who is the focal point of the men on the job. If there is anything in the way of disturbances, the man himself usually does not take it up with his leader man or foreman; he calls the attention of the shop steward to the situation and asks he do something about it.''

Appellant Bucchierre is not a member of the painters' union, but is in fact employed as janitor in an office building. There is testimony that from time to time he informed men desiring work in the shipyards that he could get them accepted as members of the painters' union (membership in a labor union being a prerequisite to obtaining employment), and secure jobs for them upon the payment of an initiation fee to the union of $50 and dues at the rate of $2.05 a month. In addition, an amount represented as the cost of obtaining

the job was charged, which amount varied somewhat in different instances, and was sometimes increased during the negotiations, sometimes following conversations between appellants in the presence of the applicant but in the Italian language which he did not understand. No receipts were given by Bucchierre for payments so made to him. In one instance a request for a receipt was refused by Bucchierre with the explanation that he gave none for the reason that he had to share the money with someone else.

Among the men so contacted by Bucchierre was one Bernzott who testified relative to a conversation held by him with Bucchierre at the latter's apartment: "A. At that time we were talking about working, and Bucchierre asked me if I could paint, and I said 'very little.' Q. You said very little? A. Yes. So he asked me if I would like to get on at the Bethlehem Steel. Q. What did you say? A. I said I didn't think I could make it; I didn't have the experience. Q. I see. What did he say? A. He said he could arrange to get me in the union, and I would be able to get in. Q. What did you say? A. I said I would think it over. Q. Was there anything said at that time of the expenses of getting into the union or getting into the shipyards? A. Yes, I inquired about that, and he said it would cost $150.00 plus $52.00 for initiation fee. . . . Q. What did you say when Bucchierre told you that? A. I told him I would think it over. Q. What did Bucchierre say? A. Bucchierre told me to come back again later. Q. Did you return again to see him? A. I did, sir. Q. Did you have any further conversation about going into the union and going into the shipyards? A. As far as I remember, I told Louis I would like to try to get in then. . . . Q. Did you say anything to him about whether or not you had the money to put up for the initiation fee? A. He mentioned it would cost $50.00, that I would have to pay when I went over for initiation. I said I didn't have it. . . . Q. What did he say? A. He mentioned that he would loan me the $52.00 . . . Q. Directing your attention to the night of September 23rd, I will ask you whether or not you were initiated into the union that night as indicated here on your application . . . September 23rd, 1941? A. I believe so, sir. Q. Where were you initiated? A. On 14th and Guerrero. Q. On 14th and Guerrero. The Building Trades Temple? A. Yes. Q. With

whom did you go over to the Building Trades Temple that night? A. With Mr. Bucchierre. Q. Where did you meet Mr. Bucchierre that night? A. In his apartment. Q. On Golden Gate Avenue? A. Yes, sir. Q. How did you go from his apartment on Golden Gate Avenue to 14th and Guerrero? A. We walked over, sir. . . . Q. Arriving there, did Mr. Bucchierre put you in touch with any member of the union, or introduce you to any people? A. He introduced me to several fellows there. Q. Were you initiated? A. Yes, sir. Q. Did Mr. Bucchierre ever give you the $52.00 in your hand? A. No, sir. Q. When you were initiated, did it come to your knowledge that your initiation fee and two dollars dues had been paid? A. Yes, sir. Q. You had not paid those yourself? . . . A. No, sir. Q. They must have been paid by somebody else because you didn't pay them? A. Evidently. Q. Directing your attention, then, to November 6th, 1941, I will ask you whether or not you were given a job or dispatched to a job at the Bethlehem Shipbuilding Company at that time? A. Yes, November 6th. Q. Prior to November 6th, 1941, or about that time, who was it that notified you that there was a job for you at the Bethlehem Shipbuilding Company? A. I received a phone call . . . I was not at home, but I was informed by my landlord that Louis Bucchierre had rung up to tell me to come down, that he had some news for me about a job. Q. Did you go and see Louis Bucchierre as a result of receiving that information? A. Yes, sir. Q. What, if anything, did Louis Bucchierre say to you on that occasion about a job? A. He told me that I would go to work the next day, the 6th, and to report down to the union office. Q. Report at the union office. Did you report there on the 6th? A. Yes, I did. Q. November 6th? A. Yes. Q. Were you given this dispatching sheet, a couple of other sheets to take to the *Union Iron Works*? A. Yes. Q. You went to work and worked there ever since? A. Yes. Q. Did Bucchierre ever talk to you about how that $150.00 that it would cost you for the job, and $52.00 he loaned you for initation fees and dues had to be paid back? A. $25.00 a week. Q. He told you $25.00 a week? A. Yes. Q. Directing your attention to the week following your employment at the Bethlehem Shipyards, did you go to Bucchierre and make your first payment of $25.00? . . . A. After my first week's

work, yes, sir. Q. I will ask you at that time whether or not there was any request by you for a receipt for the $25.00 that you paid? A. Yes, sir. Q. What did Bucchierre say when you asked him for a receipt for the $25.00? A. He doesn't give a receipt. Q. Did he make a suggestion to you as to how to keep track of the money you paid? A. Yes, on the stub of each check we receive. Q. He told you to keep track of it on the stub of your own checks that you received? A. Yes, sir. Q. At that time, fixing the date as November 15th, 1941, I will ask you whether or not there was any demand made of you by Louis Bucchierre to give him a promissory note or a memorandum of the balance you owed him after paying the $25.00? A. Yes, there was. Q. Did you as a result of that demand write out any wording, memoranda or acknowledgment of the indebtedness? A. Yes, I did. Q. Who dictated that? A. Louis did himself. Q. I show you here a note or a memorandum, and ask you—can you recognize that and tell us whose handwriting it is? A. Yes, that is my own handwriting. Q. Is that the thing that you wrote at Louis Bucchierre's dictation on the night of November 15th, 1941? A. Yes, sir, that is right, sir. Q. That is the occasion of you giving the $25.00 payment. A. Yes, sir. Q. And it acknowledged a balance of indebtedness to him from you, is that right? A. That is right.''

All of the witnesses told in substance the same story as to plan and design. One, apparently quite friendly to Bucchierre, after having testified that he paid $185 for the job, stated that ''It was a loan of $50.00 with interest . . . and $130 besides that.'' There was further testimony that if on account of illness, or for other reason, the repayment of the loans by Bucchierre was delayed, he became very angry and asked the borrowers whether they would prefer to go back to W.P.A. One witness at a morning session gave testimony favorable to Bucchierre, but at his father's request returned to the witness stand in the afternoon and told an entirely different story, testifying that what he had said in the morning was upon Bucchierre's solicitation.

The financial secretary and assistant business agent for the union testified that at one time Bucchierre came to the union office and, stating that he had loaned certain men money to join the union, demanded to know why they had not been

put to work. He "made a comment like this" to the financial secretary's predecessor there present: "What kind of a game are you playing?" This witness further testified that at one time, because of weather conditions and because of the abundance of skilled men available, he had recommended to the union that no new applications to membership be accepted, which recommendation the union adopted; that subsequently when applications already on file were presented at a class for initiation, he noticed that some of the names had not been among those previously given Vale and Cato; he also noticed that these new names were credited with payment of their initiation fees in full. He testified that upon examination he noticed that some of these applications had been originally filed by other persons, and part of the initiation fees already credited; that data had been erased from the applications as originally filled out and new data to cover the new applicants substituted therefor. On such applications, Vale and Cato appeared as members of the investigation committee, and Cato appeared on some also as a sponsor. There was testimony by some of these applicants that they had contacted both appellants in connection with negotiations to join the union and obtain employment in the defense industries.

At times Cato met the applicants for admission to the union through Bucchierre at the latter's home and elsewhere, and the evidence shows that some of those passed upon by Cato as a member of the examining board had no painting experience. There was testimony by one of such applicants, who also testified as to the amount he paid Bucchierre for his job, as follows: "Q. Directing your attention to the next night, Monday night, July 15th, 1941, at about 7:30 o'clock, did you in fact go over to Bucchierre's home at 1273 Golden Gate Avenue? A. I did. Q. Did you meet Bucchierre there? A. Yes, I did. Q. Did anybody else come in later? A. Nobody. Q. How did you go to Oakland? A. Cato come over in his car and we went over. Q. Cato came in later, is that correct? A. We met him downstairs. ... Q. I see. Cato took you and Bucchierre in his automobile, did he? A. Yes, he did. Q. Where did he take you? A. Over to Oakland. ... Q. I see. Were you initiated that night? A. Yes, I was. Q. You are now a member of Ship Painters Union, Local 961? A. That is right.

Q. You were initiated on the night of July 15th, 1941, in Oakland, is that correct? A. That is correct. Q. Now, Mr. Rochlin—by the way, did you pay your $52.00 that night? A. Yes, I did. Q. Prior, before July 15th, 1941, did you at any time receive an application to fill out for membership, or initiation into the union? A. Yes, I did. Q. Was that days or weeks before July 15th, 1941? A. Weeks. . . . Q. Who gave you the application to fill out? A. Mr. Bucchierre . . . Q. How did you fill it out—yourself, or what happened about it? A. Well, he gave me the application, and he gave me Cato's address, and I went over to Cato's house and Cato helped me fill it out. Q. Did you have any conversation with Cato when Cato helped fill it out—did you have any conversation with Cato about your experience as a painter? . . . A. Yes, he asked me how many years I had of experience as a painter, and I told him 'None.' He said, 'Put down three years.' . . . THE COURT: You filled that application out yourself, did you? A. No, I just signed my name to it. Q. Who filled it out? A. Cato did.''

One witness testified that following his employment Cato came to him in the shipyard and stated that Bucchierre owed him $25. He requested that the witness pay him (Cato) the money the witness still owed Bucchierre. The money was accordingly paid Cato. Another witness testified that he paid part of the fee charged to Cato, and that Bucchierre requested that the balance be paid to him (Bucchierre) direct.

The plan or scheme adopted by appellants to injure the employers, the union and the applicants for membership thereto is one easy to be rectified as shown by the apparent cessation of these practices upon the assumption of office by a new secretary-treasurer.

█ Before taking up the main points advanced by the appellants for reversal of the judgment, we may dispose of one, apparently brought forward as an afterthought. In their closing brief they urge prejudicial misconduct on the part of the district attorney in that he ''brought out the fact that Harry C. Vale, one of the members on the Union's Examining Board, together with appellant Cato, was an ex-convict, and emphasized the point in his argument . . . ; in view of the fact that the District Attorney improperly brought out that the appellant Bucchierre was held for the Immigration Authorities . . . ; and in view of the fact that the District

Attorney, with even greater impropriety, brought out the fact that the appellants had previously been in trouble with the Federal Authorities.'' No analysis of the circumstances under which the alleged misconduct occurred is contained in this brief, nor is any case cited by appellants in support of this contention.

An examination of the record reveals evidence by defendant Cato of his participation in other offenses. In this regard, one argument presented by him was that he would not be involved in a matter of this nature while he was *still* on parole. In some instances, in the matters called to our attention, no objection appears to evidence of this kind, but wherever one was presented, the court ruled in favor of the defendants and instructed the jury to disregard plaintiff's offer of proof. While the conduct of the district attorney may in some instances not be approved, in view of the fact that the jury knew of Cato's record, and that the trial court clearly indicated to the jury that evidence relative to the criminal record of others was not pertinent to the issue, and instructed the jury to disregard it, we may not direct a reversal herein.

█ It is contended that the People failed to prove two essential elements of the criminal conspiracy as alleged, namely, guilty knowledge as to license requirements, and agreement. Both questions are issues of fact.

It was stipulated that appellants did not have a license, and the defense was based not upon any claim that they were not guilty of the substantive offense, but rather, that there was no evidence sufficient to prove a conspiracy. No evidence appears that either defendant was unaware that a license was necessary under the law of this state. In the absence of such claim the People were entitled to have the jury determine from all the facts and circumstances as presented whether the defendants realized that they were engaged in the commission of the substantive offense.

Whether there was an agreement between the parties named in the indictment to commit a conspiracy is a question of fact. █ The testimony heretofore related, as it appears in the record, amply supports the charge of conspiracy. To accomplish the scheme Bucchierre needed a confederate in the union. That he was successful is shown by the meeting of Cato and the applicants in Bucchierre's quarters, the trans-

portation by Cato of the applicants to the place of initiation, alteration of the application blanks, the sponsoring of preferred applicants, advice to insert false information in the application, and, finally, the collection of part of the fee in a few instances direct from the applicant.

■ An unlawful conspiracy need not be proven by direct evidence. (*People* v. *Yant*, 26 Cal.App.2d 725 [80 P.2d 506] ; *People* v. *Gregory*, 12 Cal.App.2d 7 [54 P.2d 770] ; *People* v. *Dal Porto*, 17 Cal.App.2d 755 [62 P.2d 1061, 63 P.2d 1199].)

■ The association of persons with an honest intent is not conspiracy, and one of the tests on a conspiracy trial is, did the accused act in ignorance without criminal intent? In other words, did they honestly entertain a belief that they were not committing an unlawful act? (*People* v. *Eiseman*, 78 Cal.App. 223 [248 P. 716].)

■ After instructing on the provisions of section 1581 relative to the conduct of an employment agency, the court further instructed: " . . . if you find beyond a reasonable doubt from all of the evidence in the case that the defendants, or either of them, by agreement between themselves or with any other person, however or wherever that agreement was made, to pursue a plan to do any of the things described in section 1551 of the Labor Code without having a license so to do, as required by section 1581 of the Labor Code of California, and that anything was done by either of them by way of an overt act, or act toward the accomplishment of such plan, then it will be your duty to return a verdict of guilty as charged in the first count of the indictment against the defendants, or either of them, as the case may be." It is contended that the absence from the instruction of a statement that there must be a corrupt motive or intent, requires a reversal. Whatever criticism may be aimed at this instruction, standing alone, the defect was cured by other instructions.

The jury was instructed that "conspiracy is a combination of two or more people together to do an unlawful act"; that "mere association . . . does not create a conspiracy"; "that it is not unlawful for two or more people to agree to do something that can be done lawfully by one person"; "it is the joint intention of all of them to do something unlawful that makes the crime"; that the defendants "must have had a common intent, amounting to an express or im-

plied agreement or tacit understanding between them to commit the crime as charged herein." All of the preceding quotations from instructions are taken from those given at the request of at least one of appellants. If they desired further instructions on the subject of knowledge and intent, it was their duty to present them to the court. ▋ When the court fairly charges the jury on matters pertaining to the essential issues, but fails to give some specific instruction that may be of advantage to one side, such failure, in the absence of a request for such specific instruction is not ordinarily prejudicial error. (*People* v. *Warren*, 16 Cal.2d 103 [104 P.2d 1024].)

▋ The principal point raised on this appeal is whether the superior court had jurisdiction over the trial of the case. Section 182 of the Penal Code in five subdivisions describes particular types of activity, the conspiracy to do which constitutes criminal conspiracy. The first subdivision covers that to commit any crime. The fifth provides: "To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws." The two following paragraphs of the section prescribe the punishment: "When they conspire to commit any felony, or to commit any act injurious to the public health, or to public morals, or tending to pervert or obstruct justice, or the due administration of the laws, they shall be punishable in the same manner and to the same extent as in this code provided for the punishment of the commission of the said felony or act, respectively.

"When they conspire to do any of the other acts described in this section they shall be punishable by imprisonment in the county jail or state penitentiary not exceeding two years, or by a fine not exceeding five thousand dollars, or both, and cases of such conspiracy may be prosecuted and tried in the superior court of any county in which any overt act tending to effect such conspiracy shall be done."

In *People* v. *Vanderpool*, 20 Cal.2d 746 [128 P.2d 513], in approving certain conclusions reached in *Doble* v. *Superior Court*, 197 Cal. 556 [241 P. 852], the court said (pp. 748-749): " . . . by virtue of the designation and inclusion of the phrase 'in this code,' the first penal paragraph is referable to conspiracies to commit felonies and acts injurious to public morals only when the punishment for the commission

of such felonies or acts is prescribed by some provision of the Penal Code. Under all other circumstances, said the court, the second penal paragraph controls . . . if the offense is not a crime against public morals, or being such, if it is not made punishable under some provision of the Penal Code, then a conspiracy to commit it is punishable under the second penal paragraph of section 182 as either a felony or a misdemeanor and is one within the jurisdiction of the superior court.'' In the Vanderpool case a conspiracy to violate the Small Loan Act (Stats. 1939, ch. 1045; Deering's Gen. Laws, 1939 Supp., Act 7700) was classified as injurious to public morals. A conspiracy to violate section 1581 of the Labor Code by conducting an employment agency without securing a license should likewise be classified as within the provisions of section 182. The act provides that the Labor Commissioner shall be satisfied of the good moral character of an applicant before issuing a license and shall have the power to revoke a license of one who has ceased to be of good moral character. (Labor Code, §§ 1583, 1584, 1596.)

It was held in the Vanderpool case that the judgment of conviction should be reversed for the reason that the Small Loan Act did not specify the punishment for a violation of its terms; that recourse to the Penal Code was therefore necessary, and that the punishment was that provided by section 182 thereof. The Employment Agency Act specifically defines a violation of the substantive act to be a misdemeanor and sets forth the punishment (Labor Code, § 1648) without reference to any section of the Penal Code. The provision for punishment in the Employment Agency Act differentiates it from the Small Loan Act, and the holding in the Vanderpool case. The punishment for a conspiracy to violate the Employment Agency Act being within the second penal paragraph of Penal Code, section 182, the superior court had jurisdiction of the offense alleged in the indictment. (*People* v. *Vanderpool, supra; Doble* v. *Superior Court, supra.*)

Appellants contend that ''the offense charged herein was actually punishable under section 435 of the Penal Code at the time the indictment herein was returned, but said section was, by the 1941 legislature, repealed and placed in the Business and Professions Code, section 16240.'' The record indicates appellants are in error. The indictment was presented and filed January 26, 1942. Penal Code section 435 was repealed (Stats. 1941, ch. 61) effective on the ninety-first day

after June 14, 1941. Appellants urge that there is no inherent reasonableness in changing the punishment for such conspiracy merely because of a recodification. ■ The words "as in this code provided" (Penal Code, § 182) refer to the Penal Code. (*Doble* v. *Superior Court, supra; Kahrs* v. *County of Los Angeles,* 28 Cal.App.2d 46 [82 P.2d 29] ; *People* v. *Vanderpool, supra.*) Any change in the provisions of section 182 would be strictly a legislative function. ■ The Legislature is assumed to have enacted the Employment Agency Act in view of existing laws and decisions. (*Miller* v. *McColgan,* 17 Cal.2d 432 [110 P.2d 419, 134 A.L.R. 1424] ; *Whitley* v. *Superior Court,* 18 Cal.2d 75 [113 P.2d 449].)

The judgment is affirmed.

Knight, J., concurred.

PETERS, P. J.—I concur in the reasoning and conclusions contained in the opinion prepared by Mr. Justice Ward. The most debatable problem involved is whether the charged offense was a misdemeanor or a felony. The problem arises because of the unfortunate terminology employed in section 182 of the Penal Code. It provides, among other things, that when the defendants conspire to commit any act injurious to the public health or public morals "they shall be punishable in the same manner and to the same extent as in this code provided for the punishment of the commission of the said . . . act." Thus, a conspiracy to commit a misdemeanor injurious to public morals which is made punishable by the Penal Code, constitutes but a misdemeanor (*Doble* v. *Superior Court,* 197 Cal. 556 [241 P. 852] ; *People* v. *Vanderpool,* 20 Cal.2d 746 [128 P.2d 513]), but, under the same cases it is held that, if the conspiracy is to commit misdemeanors injurious to public morals that are made punishable by some code or statute other than the Penal Code, the conspiracy can constitute a felony. In recent years, with the increased codification of many phases of our law, it is purely a matter of chance whether the misdemeanor is made punishable by the Penal Code or by some other code or statute. Whatever justification may once have existed for such a differentiation no longer exists. It would seem that the problem is one that well might be studied by the Legislature and curative legislation passed if the Legislature determines that to be desirable.

So far as the alleged prejudicial misconduct of the district attorney is concerned, it should be noted that the point is raised for the first time in the appellants' closing brief filed by permission of the court after oral argument. The result is, that in the normal course, the attorney general has had no opportunity to answer the contention. Such practice should not be condoned.

Moreover, the appellants mention the point at but one page of their brief and simply refer to the pages of the transcript where the alleged misconduct occurred. No analysis of the circumstances under which the alleged misconduct occurred is contained in the brief, nor is the fact mentioned that every time appellants' counsel objected and asked the trial court to direct the jury to disregard the question the objection was sustained and the jury directed. Not one case is cited by appellants in support of this contention. Under such circumstances I do not feel that this court is required seriously to consider the point.

The evidence shows that appellants and Vale engaged in a form of enterprise that is subject to the strongest condemnation. They entered into a deliberate and intentional conspiracy to prey upon and deceive the union and the employers, and to prey upon prospective employees. The activities of these appellants are fully and fairly described in the majority opinion. That they knew they were violating the law requiring a license is a reasonable inference from the evidence.

Appellants' petition for a hearing by the Supreme Court was denied March 15, 1943.