[Crim. No. 4762. Second Dist., Div. Two. June 19, 1952.]

THE PEOPLE, Respondent, v. ADELBERT JOHN
McLAUGHLIN et al., Appellants.

Ward Sullivan for Appellants.

Edmund G. Brown, Attorney General, Frank Richards, Deputy Attorney General, S. Ernest Roll, District Attorney, and John Barnes, Deputy District Attorney, for Respondent.

MOORE, P. J.—The seven appellants were convicted of a conspiracy to violate sections 31 and 32 and subdivisions 1, 2, 4 and 6 of section 337a of the Penal Code. The proceedings were suspended as to McLaughlin and O'Leary; they were placed on probation for a term of years, nine months thereof to be served in the county jail. Judgments were entered for each of the five women to serve a jail sentence of 90 days each. Thereupon, execution of their sentence was suspended and each of them was granted probation for two years. All have appealed from the order denying their joint motion for a new trial insisting that (1) the verdicts are contrary to the evidence and to law, (2) there were errors on questions of law arising at the trial, and (3) the jury was misdirected.

### EVIDENCE SUFFICIENT

In March, 1951, McLaughlin and O'Leary, who were brothers-in-law, were engaged as partners in a "wire service" business. For three years they had operated such business which they had taken over from McLaughlin's father. When arrested they were operating at 847 North S. Street, Los Angeles. The premises were rented to McLaughlin in the name of the United Hosiery Company. Thereafter the monthly rental was paid in cash, the receipt therefor being made out to United Hosiery Company and given to McLaughlin. The application for the installation of telephones at that address was made on behalf of the United Hosiery Company by one John Chesterton. The women codefendants were employees of the two partners.

The conduct of a "wire service" was not the subject of the indictment. The prosecution was instituted against appellants for conspiring and agreeing to aid, abet and encourage other persons in the commission of the crime of bookmaking in violation of section 337a, subdivisions 1, 2, 4 and 6, and that the conspirators would conceal and aid diverse persons who, to the knowledge of the defendants, were prin-

cipals in the commission of the felonies of bookmaking as described in said statute, with the intent on the part of the defendants that such persons might and would avoid and escape from arrest, trial, conviction and punishment. The service had originated prior to the time its domicile was established at 847 North S. Street. The senior McLaughlin had operated it at 1357 North W. Street for two years during which time the listing of the telephones in his name remained unchanged until the telephone company disconnected them, pursuant to the orders of the police department. O'Leary thereupon attempted to obtain a listing in his own name, the telephone to be used for giving race results. "This effort failed," state appellants in their brief, "the telephone was refused by the telephone company and the defendant O'Leary found that he could not get a telephone in his own name." During the period McLaughlin and O'Leary were operating the wire service they received 25 letters from the telephone company in which they were advised that their telephone service was being disconnected because the telephone company had been informed by the police that they were using the telephones to aid and abet bookmaking. They then rented the office of a real estate broker on Western Avenue with three instruments. After a year had elapsed the police found them and again the company disconnected the instruments. O'Leary testified he did not "know where we went from there; we just kept moving around, I would say about 25 times, the same procedure all the time."

Bookmaking in Los Angeles County is ordinarily conducted with the use of scratch sheets, markers, cards, telephones and "wire service." The California Digest is also used in connection with the distribution and receipt of the latest race results. This digest carries the code numbers of the horses currently running. It cannot be bought where periodicals are usually available but evidently is obtained by subscriptions of bookmakers and "wire service" operators and is delivered surreptitiously. Scratch sheets carry information concerning races and tracks, horses and jockeys. About the business have developed numerous phrases descriptive of adjuncts ordinarily indispensable.

"Wire service" is indispensable to an up-to-date bookmaker's success. It reports to him in code the "off time," number of horses, their index numbers taken from the California Digest, the winners of the race and the order of their finish,

the mutuels paid by each, the amount paid for the winners in their order and "the post time of the bottom race." So important is "wire service" to the bookmaker that he pays $35 a week for it. And so lucrative is the service that on being denied a listing for a "wire service," those engaged in the business procure their telephones by using fictitious names or other subterfuge to outwit the police. O'Leary paid one party $100 for obtaining telephones for the place on S. Street. Ninety-nine per cent of the customers of "wire service" are bookmakers. Such patronage is gained by virtue of the fact that "wire service" can supply information faster than any other system that has been devised, as a rule within 90 seconds after the race is run. The same news by radio takes from 20 to 45 minutes.

The partners knew that most of their patrons were bookmakers. McLaughlin had worked at bookmaking and knew of the need of the bookmakers for wire service. They rarely or never saw their customers who paid for the service in cash but never received receipts. Giving receipts, testified O'Leary, was "not in the line of this business."

When the police learned of the operations on S. Street they caused a dictaphone to be there installed. After that, evidence was gathered by the police which proved that appellants were giving out information required by bookmakers on the races run daily. The officers visited the house, found the five women appellants at work, four of them answering the eight telephones, giving results of races by number. The officers took charge of the telephones, answered the customers and obtained the telephone numbers of some of them. After the officers departed the girls engaged the customers in conversation about the call of the police and the fear the latter might have obtained the telephone numbers of the customers. The women attempted on the telephone to soothe and reprove the customers who called on the telephone and to emphasize the necessity of never giving their own numbers to a telephonic inquirer. Some of them talked about having worked in bookmaking phone spots and two days later in a conversation among themselves they discussed the matter of "going back to work for bookmakers and of the open cash rooms in town."

In a conversation with the officers on March 28, 1951, appellant Ille said, "I know we warned the bookmakers that you guys had their numbers." Appellant Tomczishin said, "Most of the guys who use our service are books. We have

code names for all of our customers." Appellant Reeve said, "I guess you wouldn't understand why we warn our customers, but after'. . . . so long you get to know them and like them and don't want to see them get arrested." Appellant Seba said, "We warned all the bookies not to give their phone number because we didn't want them to get in trouble." Such statements serve to show the generous service afforded by "Wire Service" in saving the bookmakers from arrest.

Further proof of the protection enjoyed by the bookies as patrons of appellants is found in the experience of Officer Lestelle, who while at a place on Ceylon Street answered a telephone call from appellants' office. Miss Reeve said, "Service" and gave the results on a race. Pretending to be a patron and about to change his location, he asked for her number in order to call her, but she declined to give it and referred the call to McLaughlin, who also refused to give the number. However, he took the number of the witness and said he would code it.

Following the visit to the house on S. Street the officers called at several addresses, the telephone numbers of which they had obtained in answering the telephones at the S. Street location. In each of them the officers found various paraphernalia usually found in the headquarters of bookmakers. In one place the officer answered the telephone call of a lady who wished to place a bet and also observed a patron who entered and demanded the money which he had won on a race.

Appellant Seba worked in a fully equipped "phone spot" in Los Angeles in 1946. She and a male companion were arrested·for bookmaking. Appellant McLaughlin was arrested for operating a "phone spot" about 1941, in Los Angeles. Some six years thereafter he was found in a bookmaker's headquarters in the rear of a store in East Los Angeles with 11 male companions sitting around a table. The place was equipped with all necessary paraphernalia, including nine telephones.

Numerous other instances were detailed by witnesses which left no room for doubt that "wire service" is an important and necessary adjunct to bookmaking and that appellants jointly and severally knew that by furnishing the wire service they were aiding, abetting and encouraging violations of section 337a. Also, they had knowledge of decision No. 41415 of the Public Utilities Commission which by implication is

included in every contract made for the installation of telephones. That decision recites that "in order to conduct successful bookmaking, the operators thereof must have information in excess of that which can be obtained through regular news and radio channels. Accordingly, there has grown up a specialized wire service which has for its principal purpose the dissemination of detailed racing information within a matter of minutes after the occurrence of the actual events . . . These wire services sell this information to bookmakers who, in turn, use it in conducting their business . . . that successful bookmaking cannot be conducted without access to these wire services or without access to telephone facilities." The decision recites other reasons why communication facilities should not be furnished for use of bookmakers or "related illegal purposes" or continued where such facilities are so used.

Defendants received repeated notices from the telephone company to the effect that their telephones were being disconnected by reason of the nature of the business they were conducting. They never resisted the removal of their telephonic instruments. They made no use of judicial process to prevent the removal, nor to obtain the installation of such instruments. They merely moved to a new "spot" and continued the old traffic. Their customers were known to them only by code numbers. They gave no receipts for sales of service. The partners testified that speed in delivery of information was vital to their customers and that the latter were bookmakers. Miss Ingles testified that the wire service is characterized as "highly illegitimate"; that newspapers do not give racing results to bookmakers and scratch sheets do not give posts, names or numbers which "wire service" does.

Because four of these appellants were experienced bookies it was a reasonable inference that they knew how to handle the "wire service" to furnish accurate news in the code of the "California Digest." Because such service was furnished only to those who paid cash in advance at $35 per week it was a fair inference that the violator of section 337a was paying for aid and assistance in his operations.

The partners were not "babes in the woods." McLaughlin was reared in the "wire service business." Since he took it over from his father it is a logical assumption that the son was advised of the lawlessness of the enterprise. Moreover, before embarking upon his father's course McLaughlin had

been a bookmaker. He surely learned there the advantages to a bookie in having "wire service." Since O'Leary knew that most of his patrons were bookmakers it was not difficult for the jury to believe that the brothers-in-law were conscious of aiding and abetting criminal acts and that they proceeded on their course wilfully and knowingly. Their codefendants were no more in the dark than the partners. They knew so well the importance of the secrecy that must surround the "wire service" that they advised the bookmaking customers not to give their own numbers to any person who called them. Also, their conversation at the house on S. Street, following the raid by the police, disclosed their intimate knowledge of the bookmaker's methods and his need for the "wire service" and such assistance as appellants might furnish. From that and other conversations heard over a dictaphone it was proved that appellants warned bookmakers to evacuate those spots whose telephone numbers had been obtained by the officers. Thus, it is clearly established that the conspiracy was understood by all appellants. Each knew that he was part of an organized group to aid and abet violations of the Penal Code.

Appellants say they are innocent because they had no criminal intent, no corrupt motive, made no agreement to commit a crime. They contend that all they did was to agree to furnish racing information by wire service and that such an agreement is not a crime. Under such contention appellants make many extravagant claims and assert rare illustrations of their theses. They labor under the delusion that if they are ignorant of a statute that proscribes the doing of an act they cannot be guilty of a crime for agreeing to do such act. No doctrine is more universal or of more ancient vintage in the law than that ignorance of the *law* excuses no one. That doctrine still strides the world. Even though appellants had never read section 337a, yet if they ever accepted a bet or occupied a room with books and papers for recording bets they violated that statute. Their ignorance could not avail them in attempting to avoid conviction. Whether they ever read sections 31 and 182 of the Penal Code they are deemed to know that if they abet the commission of a crime they are principals in its commission, and that if they conspire together to commit *any crime*, they are guilty of a felony. Their only escape from the penalties of the statute is to prove that they were young children, idiots or lunatics or that they had committed the act "under an ignorance or mistake of fact." (Pen. Code, § 26.) ▮ One cannot avoid conviction if his sole defense to the indictment

is his ignorance of the law. ■■■ These appellants conspired to assist bookmakers in their operations. They had full knowledge of the crime, they knew the purpose for which the wire service was to be supplied and they sold and delivered the "service" with as much secrecy from the police as they could command enabling the bookmakers more felicitously to consummate their violations of section 337a.

Had any appellant been ignorant of the workings of the customers of the "wire service," i.e., innocent of the object to be served she would be acquitted of the conspiracy, just as happened to the defendant in *People* v. *Flanagan*, 65 Cal. App. 268 [223 P. 1014]. He had joined the I.W.W. under the mistaken belief that it was a lawful labor group. Judgment against him was reversed because he was ignorant of the criminal character of the organization, not because he was ignorant of the law relative thereto. Appellants were not ignorant of the crimes to be abetted by their "wire service" and because they knew that fact they are guilty without regard to whether they knew or did not know of section 337a.

■■■ The guilt of those who conspire to do an act which is prohibited by law is measured by their intent with reference to the act to be performed and not by the amount of their knowledge or ignorance of whether such acts are contrary to statute. (*Chadwick* v. *United States*, 141 F. 225, 243 [72 C.C.A. 343]; *Hamburg-American Steam Packet Co.* v. *United States*, 250 F. 747, 758-759 [163 C.C.A. 79].) ■■■ Knowledge of the law is imputed and need not be demonstrated by proof of the state of the inner consciousness of the actor. In other words, so long as an evil design filled the heart of a conspirator he is deemed to have known the legal consequences of his act. ■■■ An unlawful intent is logically inferred from the doing of an unlawful act. (*Agnew* v. *United States*, 165 U.S. 36, 49 [17 S.Ct. 235, 41 L.Ed. 624]; *Spurr* v. *United States*, 174 U.S. 728, 735 [19 S.Ct. 812, 43 L.Ed. 1150].)

Appellants emphasize their point that they merely supplied news of race results, "an act innocent in itself." But they give a false setting to the quoted statement. The fallacy underlying their contention is best illustrated by the case of *Myers* v. *State*, 1 Conn. 502. The defendant had loaned his carriage on Sunday under the impression that it would be used in a work of charity. Because the defendant was deceived by the borrower he did not thereby become a guilty conspirator. There was no corrupt agree-

ment for the loan because the lender was innocent of the purpose of the borrower to violate the law.

■ The gist of the crime of conspiracy is a corrupt agreement of two or more persons to commit an offense against the state. ■ Whether the conspiracy is a crime depends upon the intention of the accused construed in connection with the purpose contemplated. (*California Delta Farms, Inc., v. Chinese American Farms, Inc.,* 207 Cal. 298, 305 [278 P. 227]; *People v. Flack,* 125 N.Y. 324 [26 N.E. 267, 11 L.R.A. 807].) ■ If appellants intended to violate the law and agreed to abet others in doing so their purpose was corrupt; their intent was evil. (See *People v. Powell,* 63 N.Y. 88.)

■ Where several persons are accused of having conspired to abet others to violate the law, the only question for the trial court's determination is whether they violated the law; not whether they had knowledge of the law violated. (*Chadwick v. United States,* 141 F. 225 [72 C.C.A. 343].)

■ The court below has by the verdict of a jury determined that the intent of appellants was evil; that they agreed to assist others to violate the will of the sovereign and the facts fully justify the verdict. Therefore, since there is substantial evidentiary support for this finding, this court is powerless to disturb the verdict. (*People v. Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

### Appellants' Authorities

In support of their contention that a conviction for conspiracy can be sustained only where the conspirators have in mind the statutory provision prohibiting the act against which the conspiracy was directed, appellants have cited *People v. Eiseman,* 78 Cal.App. 223 [248 P. 716]; *People v. Bucchierre,* 57 Cal.App.2d 153 [134 P.2d 505]; *People v. Corica,* 55 Cal.App.2d 130 [130 P.2d 164]; *People v. Brophy,* 49 Cal.App.2d 15 [120 P.2d 946]. Not one of them goes so far as suggested by appellants. A close analysis will disclose that when the court observed (*People v. Eiseman, supra,* p. 247) that "the jury could not have misunderstood the court's meaning that a corrupt motive was an essential element of the crime of conspiracy" it had reference to the defendants' knowledge of the *acts* which the conspirators were to perform. It is not the penal statute that renders an act corrupt and wrongful. On the contrary, it is because of the vice in the act that the people forbid it by statute. When Mr. Wharton announced that "the confederation must be corrupt," (Wharton's Crim. Law, vol. 2, 11th ed. § 1606)

he meant that the conspirators must have had in mind the doing of an act whose results are hurtful to society. The celebrated author was attempting to follow the doctrine announced by the court in *People* v. *Powell*, 63 N.Y. 88, 92. As commissioners of charities the defendants there were accused of having conspired to refuse to advertise for bids for commodities to be used for relief. The court instructed that it was no defense that defendants supposed they might lawfully purchase without advertising for bids and were ignorant of the statute. In reversing the judgment the court declared that "to constitute crime there must not only be the act but also the criminal intention and these must concur." The court did not say that which appellants at bar are maintaining but declared that "where a man is indicted for doing a prohibited act, he will not be allowed to say that he did not know of the existence of the law he had violated."

It lies at the bottom of every case that when an evil act is prohibited a crime has been committed when that act is intentionally done, irrespective of the actor's knowledge of the existence of a statute denouncing the act as a crime.

The Powell case supplied appellants with another phrase which they have overworked in presenting their appeal, to wit, "an act innocent in itself." They argue that the act of disseminating racing news is innocent in itself. At the time of the Powell decision the act charged was not a crime (Laws of New York, 1871). But when appellants herein agreed to conduct a service helpful to the bookmaking industry they conspired to violate a law. A perusal of all the authorities cited by appellants discloses no support for their contention.

In *People* v. *Bucchierre, supra,* the defendants suffered a final conviction for conspiracy despite their ignorance of the Labor Code's provision against conducting an employment agency without first having obtained a license therefor. In *People* v. *Corica, supra,* the defendants were indicted for a conspiracy to violate section 337a. The court held (p. 134) that "to render him guilty it is not necessary that a conspirator perform some act which is in itself unlawful in carrying out the criminal conspiracy. If there is a conspiracy to commit murder by means of poison sent through the mail, a conspirator may not escape responsibility because he only agreed to and did purchase the postage stamps with which the poison is sent to the victim."

*People* v. *Brophy, supra,* was a prosecution for perjury

in two counts. The first was based upon an affidavit filed January 2, 1940.. Count II was predicated upon an affidavit filed January 6 by Brophy in the same action for injunction filed December 22, 1939, to prevent the telephone company's disconnecting his service. January 4, the company filed its answer which, by a separate defense based upon information from the attorney general, alleged that the company had been ordered by the attorney general to disconnect Brophy's service because he was using it to run a wire service, thereby enabling others to violate 337a. Brophy was acquitted on appeal because the allegations of Brophy's affidavits were not necessary and therefore his false statements were not material. Neither Brophy nor the company was accused in the injunction action of participating in the gambling enterprise maintained by the bookmakers. The decision recognizes the fact that "wire service" is one of "gangland's golden arteries" and that if the law enforcing agencies desire to succeed they must sever that channel whereby the bookmaker's profits are multiplied.

## SECTION 32, PENAL CODE*

 Appellants contend that to be guilty of an offense as accessory after the fact a person must know that the principal has committed a felony or is accused of such crime. They say that there is no direct evidence that they had knowledge of any such .violations. They did know they were delivering to bookmakers all the valuable information coming over their wire and gave counsel and support to their patrons to enable the latter to avoid arrest. A crime such as bookmaking, in violating section 337a, is a felony until judgment has been pronounced assessing a penalty less than confinement in a state's prison. (*In re Rogers,* 20 Cal.App. 2d 397, 400 [66 P.2d 1237].)

## ERRORS RE ADMISSIBILITY

 No prejudice can be successfully asserted by the admission of the findings or decision No. 41415 of the Public Utilities Commission. It was admitted without objection to be considered with the rules and regulations of the telephone company. Also it was a part of every contract for the in-

---

*Section 32, Penal Code, reads:

"Every person who, after a felony has been committed, harbors, . conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony."

stallation of a telephonic instrument. Every subscriber was bound to know its provisions. Moreover the jury were warned that it was not to be used as evidence that defendants were engaged in aiding the bookmakers. The document was properly received for the limited purpose indicated, to wit, to prove criminal intent and guilty knowledge. (*People* v. *Morani*, 196 Cal. 154, 158 [236 P. 135].)

### No Misdirection of the Jury

Assignment is made of the instruction that conspirators are guilty of a crime if they agree to aid a person who has committed or is about to commit a felony, if after the agreement they violate the law. They say that it is too broad in scope and should have been limited to only those accessories who act after the crime is complete; citing 22 Corpus Juris Secundum, page 167. Appellants were charged with conspiracy to violate the two statutes. The proof was abundant that they were involved in a continuous conspiracy. No prejudice could have reasonably resulted from the instruction even though it be broader than section 32. The evidence is plethoric that section 337a was violated.

Neither did appellants suffer prejudice from the instruction that if two conpirators agree to do a criminal act and thereafter commit an overt act in furtherance of such agreement, then such agreement and act constitute a criminal conspiracy, even though the actors believe the act is lawful. The criminal intent of appellants to form the conspiracy to violate section 337a is imputed to them by law. The case of *People* v. *Bucchierre, supra,* does not support appellants' contentions.

Order affirmed.

Fox, J., concurred.

McComb, J., concurred in the judgment.

Appellants' petition for a hearing by the Supreme Court was denied July 17, 1952. Schauer, J., was of the opinion that the petition should be granted.