[Crim. No. 5580. Second Dist., Div. Three. Jan. 17, 1958.]

THE PEOPLE, Respondent, v. MARY LOU BOWMAN et al., Appellants.

Ellery E. Cuff, Public Defender (Los Angeles), Richard W. Erskine, Deputy Public Defender, and Morris Lavine, for Appellants.

Edmund G. Brown, Attorney General, Rudolph Pacht and Norman Sokolow, Deputy Attorneys General, for Respondent.

VALLÉE, J.—Defendants were each charged in an information with six felonies. In Count I they and Jean De-Desley were charged with conspiracy (Pen. Code, § 182) to commit grand theft in violation of section 487, subdivision 1 of the Penal Code; to violate sections 11162.5, 11163, and 11165 of the Health and Safety Code (unlawfully prescribing, administering, or furnishing narcotics); to violate section 2141 of the Business and Professions Code (practicing medicine without a license); and to cheat and defraud by criminal means and to commit acts injurious to the public health in violation of sections 182, subdivisions 4 and 5, of the Penal Code. Seventeen overt acts involving facial rejuvenation treatments to six women were alleged to have been committed in pursuance of and to effect the objects of the conspiracy. In Counts II and III defendants Dr. Hixson and Mary Lou Bowman were charged with grand theft in violation of section 487, subdivision 1, of the Penal Code, on the alleged ground they feloniously took $1,000 from each Lois Earl and Elizabeth Earl. In Count IV defendants Dr. Hixon and Mary Lou Bowman were charged with having unlawfully prescribed demerol, a narcotic, for Gwen Smith in violation of section 11163 of the Health and Safety Code; and in Counts V and VI with having unlawfully prescribed demerol for Sadie Bartlett in violation of that section.

Trial was had before a jury; and after defendants rested,

the court dismissed the action against Jean DeDesley. On Dr. Hixon's motion Count I of the information was amended by deleting the allegation charging conspiracy to cheat and defraud by criminal means and to commit acts injurious to the public health in violation of section 182, subdivisions 4 and 5, of the Penal Code. Defendants were found guilty on all counts. Motions for new trial were granted as to Counts II and III and denied as to the remaining counts. Defendants were granted probation. They appeal from the judgments[1] and the orders denying their motions for a new trial as to Counts I, IV, V, and VI.

Defendant Hixson was a regularly licensed physician and surgeon in California and had practiced in Beverly Hills for 24 years. He specialized in internal medicine, diagnosis, and endocrinology, and was a member of various medical associations, societies, and fraternities.

Defendant Bowman in 1932 received the degree of Doctor of Divinity from the Church of Divine Wisdom. Thereafter, she used the title ''Doctor.'' She was also a graduate of the Los Angeles University of Physiotherapy and Massage. She had been engaged in nursing work and physical therapy, and had been instructed in the use of the hypodermic and had given hypodermic injections. She was not a registered nurse. She did not have a license for the operation of an establishment in which ''lying-in patients'' were kept.

In December 1952 Bowman went to Dr. Hixson for a physical examination so she could undergo a facial rejuvenation treatment with a Beatrice Stone. On several occasions they discussed facial rejuvenation. Dr. Hixson told Bowman about Madame DeDesley and said she was ''the dean of facial rejuvenators.''

On June 15, 1953, Dr. Hixson telephoned DeDesley and introduced Bowman to her over the telephone. Bowman then saw DeDesley. Bowman related to Dr. Hixson her conversation with DeDesley. He encouraged her to buy DeDesley's formula for facial rejuvenation. Bowman entered into a contract with DeDesley to purchase the formula and to learn from DeDesley how to give the treatment and how to care for the women during the treatment.

On the same day Bowman showed Dr. Hixson the formula. Dr. Hixson made a list of all the blood chemistries he would like to have done, urinalysis, and phenol determination on both

---

[1]An order granting probation is deemed a judgment for the purpose of appeal. (Pen. Code, § 1237.)

the blood and the urine. Bowman took the list to the Galen Laboratories and made arrangements to have the tests run and for their payment. It was agreed Dr. Hixson would examine the women who were to undergo the treatment and supervise the medical care which they might require. In turn, Bowman was to furnish Dr. Hixson with scientific laboratory tests and reports as to how the treatments progressed in order that he might analyze them and prepare a scientific paper on the work for the American Medical Association. Bowman testified Dr. Hixson gave her a blood pressure kit and a stethoscope, which she used.

Dana Howard volunteered to take the treatment. She was told DeDesley would give the treatment. On July 9, 1953, Bowman took Mrs. Howard to Dr. Hixson for an examination. Mrs. Howard had not known him. He gave her a physical examination. She then had a blood count taken and a urinalysis at the Galen Laboratories. She met DeDesley in Bowman's home. DeDesley mixed the formula and applied the liquid to her face. Bowman was present, but not Dr. Hixson. The treatment consisted of the following: A liquid was applied to the left side of Mrs. Howard's face under the eye, down toward the chin and to the sides of the face over an area of about an inch at a time. It produced a burning sensation. It was then swabbed with cotton. Three or four layers of adhesive tape were put on the skin. Then layers of cotton were put over them. After an interval of nearly an hour the right side of the face was treated; after waiting another two hours the nose and upper lip were treated. The entire face was tied with gauze. Mrs. Howard was then put in a hospital bed in one of Bowman's bedrooms. The bandage was left on her face for 48 hours, during which time she had a "decided discomfort" from the area that had been covered. The bandages were removed and a powder applied. It was patted on continuously over a period of several days. A mask formed by the powder stayed on the face for nine days. When the mask was removed her face was quite red; the mask was filled with pus and corruption. Unguentine was then applied. Mrs. Howard's forehead and the lower part of her face received about the same treatment; only her face was treated.

Mrs. Howard did not take any medication during the course of the treatment except a few pills which Bowman gave her "to relieve the itching." Bowman gave her some "Empirin-Codeine" to be taken "if I were suffering too much." Bowman made daily notations of Howard's physical condition on

a chart. About August 9 Mrs. Howard left Bowman's home. At that time there was a chafed and abrased condition under her chin. On that day she and Bowman went to Dr. Hixson's office where he looked at her face. About six weeks later keloids began to appear on the left part of her jaw.

Helene Bell, Gwen Smith, Sadie Bartlett, Lois Earl, and Elizabeth Earl underwent treatment at Bowman's home similar to that given to Dana Howard. DeDesley administered the treatment to Helene Bell in the presence of Dr. Hixson and Bowman, after she had been examined by Dr. Hixson. While Helene Bell was in Bowman's home over a period of six weeks Bowman gave her some codeine pills and injections of demerol in her hip to quiet her nerves and relieve the pain.

In the latter part of 1953, Bowman met a Dr. Shifrin in Las Vegas and obtained a new formula from him.[2] She discussed this formula with Dr. Hixson and told him she was abandoning the DeDesley formula and using the Shifrin formula.

Gwen Smith's face was dark brown from a "skin peel." She consulted Dr. Hixson who diagnosed her condition as glandular. She requested Bowman to give the treatment over the dark area. Bowman took her to Dr. Hixson, who gave her a physical examination. At Mrs. Smith's request Dr. Hixson wrote a prescription for "Demerol 10 cc . . . To be admin by nurse as directed," (Count IV), and gave it to Bowman. Dr. Hixson had given Bowman directions as to administering the demerol. He told Bowman to give Mrs. Smith a hypodermic injection about 15 to 20 minutes before the application of the formula. Bowman then treated Mrs. Smith with the Shifrin formula. About 15 minutes before an application Bowman gave her an injection of demerol. When Mrs. Smith left Bowman's home she had a retraction on the tear duct of her left eye.

In early 1954 Sadie Bartlett was a patient of Dr. Hixson for ear trouble. He told her he wanted her to try the facial rejuvenation treatment. Beginning January 9, 1954, Bowman gave her the treatment using the Shifrin formula. Dr.

---

[2] The new formula reads: "1 phenol. 1 glycerin. Add croton oil if desired. 8 parts water. Oil of cloves if desired. If used as peel leave out glycerin and croton oil. Resorcinol can be added or more phenol for stronger solution, but not necessary."

Dr. Thienes, a doctor of medicine, an expert in pharmacology and toxicology, testified a solution made up according to the Shifrin formula would cause a severe burning of the skin with death to the layers of skin in which it came in contact. He said phenol is a poison and phenol poisoning can be incurred by the application of phenol to the skin.

Hixson gave Bowman two prescriptions for demerol to be given Sadie Bartlett, one on January 12, 1954 (Count V), and one on January 16, 1954 (Count VI). These prescriptions were made in the name of Sadie Bartlett, called for "Demerol 10 cc," and stated "To be administered by nurse as directed." On January 12 Dr. Hixson told Bowman to give one or one-and-a-half cc's of demerol intramuscularly in the hip when Sadie Bartlett was suffering intense pain, and that it should be administered about 15 minutes before she began the application. This was done. Some time after the treatment had been completed and she had gone home, little lumps appeared under Mrs. Bartlett's chin.

Elizabeth Earl was the daughter-in-law of Lois Earl. Elizabeth became a patient of Dr. Hixson in 1946 or 1947. She met Bowman in Dr. Hixson's office in late 1953. About January 21, 1954, Lois Earl and Elizabeth went to Dr. Hixson's office; Lois had not been his patient. He recommended they take the treatment from Bowman and gave them physical examinations. He testified he told Lois Earl not to take the treatment because she had a viral infection; on January 23 he learned she was taking the treatment; he did not inform Bowman that Lois should not be undergoing the treatment since "she was already in it." Elizabeth and Lois Earl were given the treatment concurrently by Bowman using the Shifrin formula. The Earls lived in La Jolla, to which they returned. Keloids developed at the base of Lois Earl's neck. Elizabeth called Dr. Hixson three to five times during the next ten days or two weeks and told him of Lois' condition. She asked him to come down and do something for her. Dr. Hixson said he could not come down, and did not; he told her not to call any other doctor.

During the course of the treatments Bowman had laboratory tests made of the blood and urine of the women, the reports of which were sent to her and Dr. Hixson and discussed by them. Also during the course of the treatments Bowman kept Dr. Hixson informed with respect to the temperature, pulse, blood pressure, appetite, and elimination of the women. None of the women was given an electrolysis. Dr. Hixson testified he made out a card for each of the women he examined. He kept the cards for Helene Bell, Gwen Smith, Lois Earl, and Dana Howard in Bowman's file. On his office copies of the prescriptions for Gwen Smith and Sadie Bartlett under the word "Pathology" Dr. Hixson wrote "Electrolysis." He did the same on about four other copies of pre-

scriptions for demerol to be administered by Bowman. He testified use of the word "Electrolysis" was an honest mistake. He said that in the case of Gwen Smith he intended to write a prescription .for demerol for pain he expected her to have. Dr. Hixson was not present during the treatment of any of the women other than Helene Bell.

It is first asserted Count I of the information, the conspiracy count, does not charge a public offense. It is argued that it merely gives code section numbers and names of offenses and nothing more; that it was insufficient to inform defendants of the acts with which they were charged and thus constituted a denial of due process.[3] The charging part of the information was followed by allegations of 17 overt acts.[4] The allegations of Count I are substantially the same

---

[3]The charging part of Count I reads:

> "The said Mary Lou Bowman,
> W. C. Hixson, Jr., and
> Jean De Desley

are accused . . . of the crime of Criminal Conspiracy, in violation of Section 182, Penal Code of California, a felony, committed as follows: That the said Mary Lou Bowman, W. C. Hixon [sic], Jr., Jean De Desley, . . . did willfully, unlawfully and feloniously commit the crimes of criminal conspiracy to commit grand theft, in violation of Section 487, Subdivision 1, Penal Code; to violate Sections 11162.5, 11163, and 11165, Health and Safety Code; and to violate Section 2141, Business and Professions Code of California; also to cheat and defraud by criminal means and to commit acts injurious to the public health in violation of Subdivisions (4) and (5) of Section 182 of the Penal Code. committed prior to the filing of this information as follows:

"That continuously throughout said period of time, in the County of Los Angeles, State of California, and elsewhere, and within the jurisdiction of this court, the said defendants willfully, unlawfully, and feloniously conspired, combined, confederated, and agreed together and with each other and with divers other persons unknown, that they would commit the crime of grand theft, violate Sections 11162.5, 11163, and 11165, Health and Safety Code, violate Section 2141, Business and Professions Code, and also cheat and defraud by criminal means and commit acts injurious to the public health in violation of Subdivisions (4) and (5) of Section 182, Penal Code, felonies." Here follow allegations of 17 overt acts.

[4]The overt acts alleged were: (1) Mrs. Bowman referred Gwen Smith to Dr. Hixson for purported medical treatment and diagnosis. (2) Mrs. Bowman told Gwen Smith she knew a medical woman who knew about skin and was interested in her case; arrangements were made for Gwen Smith to meet her and Madame DeDesley; and a skin test was made on Mrs. Smith by Madame DeDesley in the presence of Mrs. Bowman. (3) Mrs. Bowman signed a credit application as "Dr. Mary Bowman" and presented it to a pharmacy. (4) Mrs. Bowman again contacted Gwen Smith and told her the treatment was safe. (5) Dr. Hixson wrote a prescription for demerol for Gwen Smith, to be administered by a nurse as directed. (6) Mrs. Bowman took Gwen Smith to Dr. Hixson's office and he told her she was physically fit to take the treatment at the hands of Mrs. Bowman. (7) Mrs. Bowman gave hypodermic injections of

as those of the indictment which was held sufficient in *People* v. *Sorrentino,* 146 Cal.App.2d 149 [303 P.2d 859]. The information in *People* v. *Roberts,* 40 Cal.2d 483 [254 P.2d 501], charged the appellant and another with conspiracy to violate section 11500 of the Health and Safety Code. The appellant contended it was insufficient because it did not specify the particular act such as transporting, selling, or possessing a narcotic that was the object of the conspiracy. The information was held sufficient, the court stating (p. 486):

"It is only required that the pleading be 'in any words sufficient to give the accused notice of the offense of which he is accused.' (Pen. Code, § 952.) Notice of the particular circumstances of the offense is given not by detailed pleading but by the transcript of the evidence before the committing magistrate (or the grand jury); defendant is entitled to such transcript under section 870 (or section 925) of the Penal Code. [Citations.] . . . The information alleges a single conspiracy with the object of accomplishing one or more types of violation of section 11500, and there was evidence which

demerol to Gwen Smith, applied a solution to her face resembling Lysol, and furnished narcotics tablets to her. (8) Mrs. Bowman told Dana Howard she was engaged in research work with Dr. Hixson and that for publicity purposes Dr. Hixson would give a free medical examination and Madame DeDesley would give her a free treatment. (9) Madame DeDesley in the presence of Mrs. Bowman applied the first treatment to Mrs. Howard and Mrs. Bowman continued the treatment. (10) On August 10, 1953 Mrs. Howard called on Madame DeDesley for a treatment for her scarred face. (11) Dr. Hixson supervised the application of a liquid to Helene Bell by Madame DeDesley in the presence of Mrs. Bowman and he gave Mrs. Bell two narcotic tablets to ease the pain. (12) Mrs. Bowman gave Mrs. Bartlett hypodermic injections of demerol, and also gave narcotics and other drugs to her while Mrs. Bartlett was submitting to a treatment with Mrs. Bowman. (13) Mrs. Bowman purchased Merck phenol from a Sam H. Feinberg and other dangerous drugs without prescriptions. (14) Dr. Hixson showed "before" and "after" pictures of the results of the facial rejuvenation treatment to Mrs. Earl and to Elizabeth; he stated he had sent patients to Mrs. Bowman for facial rejuvenation. He further told them the treatment was not painful or dangerous; he worked with Mrs. Bowman on medical research and had watched her give the treatment; and the final results of the treatment were wonderful. He told Mrs. Earl the treatments would cure her arthritis and make her skin beautiful. He called a number and handed the phone to Mrs. Earl and said, "This is Dr. Bowman," then appointments were made with Mrs. Bowman. (15) Mrs. Bowman applied a liquid to the skins of Lois Earl and Elizabeth and gave hypodermic injections of demerol and hypnotic drugs on numerous occasions. (16) After Mrs. Earl and Elizabeth returned to La Jolla they telephoned Dr. Hixson and asked him to treat them, but he refused to do so and told them not to call in any medical doctor. (17) Mrs. Earl and Elizabeth telephoned from La Jolla to Mrs. Bowman and discussed their physical condition with her.

tends to show that several objects of this single conspiracy were accomplished.''

It is argued the court erred in not striking the charge of conspiracy to commit grand theft from Count I since no overt act of grand theft was alleged. An information charging a conspiracy to commit grand theft includes a conspiracy to obtain money by false pretenses. (Pen. Code, §§ 484, 490; *People* v. *Platt*, 124 Cal.App.2d 123, 131 [268 P.2d 529].) A reading of the information in its entirety was sufficient to inform defendants that the charge of conspiracy to commit grand theft in Count I was a charge of conspiracy to obtain money by false pretenses from Lois and Elizabeth Earl.

Defendants claim Count I charges a series of alleged conspiracies and not a single conspiracy, and thus it is duplicitous and in violation of section 954 of the Penal Code. Duplicity in an accusatory pleading means the charging of more than one offense, not the charging of a single offense committed in more than one way. (26 Cal.Jur.2d 536, §§ 64, 66.) Count I charges one conspiracy committed in different ways—not more than one.

We hold Count I was sufficient to inform defendants of the charge against them and that it did not constitute a denial of due process.

Defendants assert the court erred in excluding evidence which would have tended to prove they acted in good faith; in refusing to instruct the jury that if they acted in good faith they were not guilty of a conspiracy; and in refusing to permit defendants' counsel to argue the issue of good faith to the jury. The court on three occasions sustained objections to questions asked of Bowman, and rejected offers of proof, for the purpose of showing she acted in good faith. The requested instructions are set out in the margin.[5] ''The phrase

[5]The three instructions read:

1. ''In order to prove a conspiracy the evidence must show not only that an agreement was entered into between two or more persons to do one or more unlawful acts, or to do one or more lawful acts by unlawful means; it must also show that the alleged conspirators believed that the act or acts were unlawful, or that the conspirators believed that unlawful means were to be used to accomplish lawful ends.

''An honest belief of an alleged conspirator that everything contemplated by the agreement was lawful precludes a finding that that person is a conspirator.''

2. ''An honest belief of an alleged conspirator that everything contemplated by the agreement was lawful precludes a finding that that person is a conspirator.''

3. ''An agreement between two or more persons to do an act that is actually in violation of a law is not a conspiracy to violate that law.

'good faith' in common usage has a well-defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation." (*People* v. *Nunn*, 46 Cal.2d 460, 468 [296 P.2d 813].)

The People concede that "Conspiracy requires an agreement and *specific intent* to commit the unlawful acts which are the objects of the conspiracy, plus an overt act in pursuance of such agreement." (Italics added.) Defendants rely on *People* v. *Eiseman*, 78 Cal.App. 223 [248 P. 716], and *People* v. *Bucchierre*, 57 Cal.App.2d 153 [134 P.2d 505]. The People rely on *People* v. *McLaughlin*, 111 Cal.App.2d 781 [245 P.2d 1076]. One count in *People* v. *Eiseman*, *supra*, 78 Cal.App. 223, charged the defendants with a conspiracy to violate the Corporate Securities Act. The appellants complained (p. 246) "that in dealing with the subject of conspiracy the court in one part of its charge, upon the element of intent, instructed the jury that the question for it to pass upon was whether appellants 'conspired to do the things which were in violation of law, not whether they had any knowledge that they were violating the law.' " The court held the jury could not have been misled for the reason (p. 246) "the court as a part of the same instruction also stated to the jury explicitly that mere association of individuals with an innocent purpose or with honest intent is not a conspiracy as defined by law; also that in determining the guilt of appellants upon the conspiracy charge the jury should consider whether appellants 'honestly entertained a belief that they were not committing a wrongful act' and whether or not they 'were acting under a misconception or in ignorance, without any criminal motive'; the court further stating, 'Joint evil intent is necessary to constitute the offense, and you are therefore instructed that it is your duty to consider and to determine the good faith of the defendants and each of them.' Considering the instruction as a whole, we think the jury could not have misunderstood the court's meaning that a corrupt motive was an essential element of the crime of conspiracy."

Before there can be a finding that a conspiracy to violate a law existed, it must be shown that two or more of the alleged conspirators knew that the act, or acts, agreed to be done was a violation of law.

"An honest belief of an alleged conspirator that the act agreed to be done were lawful precludes a finding that that alleged conspirator conspired to do an unlawful act."

The indictment in *People* v. *Bucchierre, supra,* 57 Cal.App. 2d 153, charged a conspiracy to violate the Employment Agency Act. The court stated (p. 163):

"The association of persons with an honest intent is not conspiracy, and one of the tests on a conspiracy trial is, did the accused act in ignorance without criminal intent? In other words, did they honestly entertain a belief that they were not committing an unlawful act? (*People* v. *Eiseman,* 78 Cal.App. 223 [248 P. 716].)"

In *People* v. *McLaughlin, supra,* 111 Cal.App.2d 781, the charge was a conspiracy to violate sections 31 (defining principals) and 32 (defining accessories) and subdivisions 1, 2, 4, and 6 of section 337a (bookmaking) of the Penal Code. The court stated (p. 788):

"Appellants say they are innocent because they had no criminal intent, no corrupt motive, made no agreement to commit a crime. . . . No doctrine is more universal or of more ancient vintage in the law than that ignorance of the *law* excuses no one. That doctrine still strides the world. . . . One cannot avoid conviction if his sole defense to the indictment is his ignorance of the law. . . . The guilt of those who conspire to do an act which is prohibited by law is measured by their intent with reference to the act to be performed and not by the amount of their knowledge or ignorance of whether such acts are contrary to statute. [Citations.] Knowledge of the law is imputed and need not be demonstrated by proof of the state of the inner consciousness of the actor. In other words, so long as an evil design filled the heart of a conspirator he is deemed to have known the legal consequences of his act. An unlawful intent is logically inferred from the doing of an unlawful act. [Citations.]

. . . . . . . . . . .

"The gist of the crime of conspiracy is a corrupt agreement of two or more persons to commit an offense against the state. Whether the conspiracy is a crime depends upon the intention of the accused construed in connection with the purpose contemplated. [Citations.] If appellants intended to violate the law and agreed to abet others in doing so their purpose was corrupt; their intent was evil. [Citation.] Where several persons are accused of having conspired to abet others to violate the law, the only question for the trial court's determination is whether they violated the law; not whether they had knowledge of the law violated. [Citation.] . . .

"[P. 791.] It lies at the bottom of every case that when

an evil act is prohibited a crime has been committed when that act is intentionally done, irrespective of the actor's knowledge of the existence of a statute denouncing the act as a crime."

If *People* v. *McLaughlin, supra,* 111 Cal.App.2d 781, holds, as it appears to do, that in a prosecution for conspiracy proof of a specific intent to commit an unlawful act or a lawful act by unlawful means is not required, it is contrary to the weight of authority and the better-reasoned cases. Much of what was said in McLaughlin seems to be dicta since the evidence clearly showed, in the words of the court, that the defendants (p. 788) "were conscious of aiding and abetting criminal acts and that they proceeded on their course wilfully and knowingly."

Specific intent in a charge of conspiracy means that the conspirators must have the intent through concert of action to do an unlawful act, or to do a lawful act by unlawful means. The essence of the offense lies in the intent; an intent to commit a specific unlawful act or to commit a specific lawful act by unlawful means. "Whenever a specific intent is an element of an offense the existence of the intent must be proved as a fact, and is not presumed from the commission of an unlawful act." (*People* v. *Flores,* 86 Cal.App. 235, 237 [260 P. 822] ; *People* v. *Wells,* 33 Cal.2d 330, 350 [202 P.2d 53].)

The decisions teem in verbalisms that in conspiracy the intent must be "evil," "wicked," or "corrupt"; that the "motives" of the participants must be "evil" or "corrupt." Some say that the "good faith" of the parties is a factor establishing a defense; others, that acting with "just cause" is a defense. What these terms mean is that the accused must have had a specific intent to do an unlawful act or to do a lawful act by unlawful means. This, in one case, may involve proving that he had the intent to commit murder; in another, that he had the intent to steal; in another, that he had the intent to violate a statute. If, in a charge of conspiracy, the act involves a violation of positive law, the People must show the accused intended to violate it, or entered into the common purpose with knowledge that a violation of law would result from the commission of the contemplated act. Proof of the mere commission of the act is not enough—there must be proof of a specific intent to violate the law, and the accused may prove he had no such intention. "It is only when the intent is not made an affirmative element of the crime

that the law presumes that the act, if knowingly done, was done with a criminal intent. [Citation.] ▉ When a specific intent is an element of the offense it presents a question of fact which must be proved like any other fact in the case. It is none the less a question of fact though it cannot be proved by direct and positive evidence. All the circumstances surrounding the act furnish the evidence from which the presence or absence of the specific intent may be inferred by the jury; and no presumption of law can ever arise that will decide it." (*People* v. *Maciel*, 71 Cal.App. 213, 218 [234 P. 877].) ▉ The accused may testify directly to what his intention was. (*People* v. *Sonier*, 113 Cal.App.2d 277, 278 [248 P.2d 155].)

In *People* v. *Flack*, 125 N.Y. 324 [26 N.E. 267, 111 L.R.A. 807], it is said (26 N.E. 269):

"The gist of the crime of conspiracy consists in a corrupt agreement between two or more individuals to do an unlawful act, unlawful either as a means or as an end. 2 Bish. Crim. Law, § 171 et seq., and cases cited. . . . The formation of a common design by two or more persons is never *simpliciter* a criminal conspiracy. This may be and often is perfectly innocent. The criminal quality resides in the intention of the parties to the agreement, construed in connection with the purpose contemplated. The mere fact that the conspiracy has for its object the doing of an act which may be unlawful, followed by the doing of such act, does not constitute the crime of conspiracy, unless the jury find that the parties were actuated by a criminal intent. In many cases this inference would be irresistible; in others the jury might find that, although the object of the agreement and the overt act were unlawful, nevertheless the parties charged acted under a misconception or in ignorance, without any actual criminal motive. If that conclusion should be reached by the jury, then, whatever other criminal penalties the parties might have incurred, the crime of conspiracy would not have been established, and the defendants would be entitled to an acquittal. The actual criminal or wrongful purpose must accompany the agreement, and, if that is absent, the crime of conspiracy has not been committed."

*Landen* v. *United States*, 6 Cir., 299 F. 75, says (p. 78): "When . . . the prosecution is for conspiracy, the text-books and elementary discussions seem to agree that there must be a 'corrupt intent,' which is interpreted to be the mens rea, the conscious and intentional purpose to break the law. Bishop's

Criminal Law (8th Ed.) §§ 297, 300; 12 C.J., p. 552, § 16; 5 R.C.L. p. 1066, § 6.''⁶

In the present case it was incumbent on the People to prove that defendants had the specific intent to violate the statutes named in Count I of the information; and defendants had the right to show they had no such intent. The court erred in excluding evidence offered by defendants for that purpose and in refusing to permit defendants' counsel to argue the question to the jury. ▮ There was no error in refusing the requested instructions (footnote 5). The subject was covered by an instruction which was given, reading:

"In the case of certain crimes it is necessary that, in addition to the intended act which characterizes the offense, the act must be accompanied by a specific or particular intent without which such a crime may not be committed.

"This [sic] in the crime of Criminal Conspiracy as charged in Count I of the Information, a necessary element is the existence in the mind of the perpetrators of the specific intent to commit the crimes set forth in Count I of the Information, and, unless such intent so exists, that crime is not committed."

▮ After the evidence was in, the court deleted from Count I of the information the parts charging that the conspiracy included the intent to "also cheat and defraud by criminal means and to commit acts injurious to the public health in violation of Subdivisions (4) and (5) of Section 182, Penal Code." Notwithstanding the fact that this part of the information had been deleted, the court told the jury in its instructions that defendants were accused of and could be found guilty of conspiracy to commit those offenses. This was error. The instruction constituted a misleading statement of the real issues and tended to confuse and mislead the jury. The verdict was general and we cannot say that the jury did not find defendants guilty of a conspiracy to cheat and defraud by criminal means and to violate section 182, subdivisions 4 and 5 of the Penal Code and not guilty of a conspiracy to violate the other statutes named in Count I.

▮ Defendants contend sections 11162.5, 11163, 11165, and 11330 of the Health and Safety Code pertaining to the issuance of prescriptions for narcotics and providing that no person shall issue a prescription that is false or fictitious in

⁶Also see *C.I.T. Corporation* v. *United States*, 9 Cir., 150 F.2d 85, 93; *Pine* v. *United States*, 5 Cir., 135 F.2d 353, 357, cert. den. 320 U.S. 740 [64 S.Ct. 40, 88 L.Ed. 439]; *Pelz* v. *United States*, 2 Cir., 54 F.2d 1001, 1005; *Mitchell* v. *State*, 248 Ala. 169 [27 So.2d 36, 38].

any respect, are unconstitutional. The contention is without merit. *People* v. *Nunn,* 46 Cal.2d 460 [296 P.2d 813], upheld the constitutionality of sections 11163, 11330, and 11164 of the Health and Safety Code. The reasoning of that case is applicable to sections 11162.5 and 11165.

■ Counts IV, V, and VI charged defendants jointly with unlawfully *prescribing* demerol, a narcotic, for Gwen Smith (Count IV) and for Sadie Bartlett (Counts V and VI). Notwithstanding the fact that defendants were charged with only prescribing demerol, the court instructed the jury that defendants could be convicted of Counts IV, V, and VI if they unlawfully prescribed, administered, or furnished a narcotic. Hixson prescribed the narcotics for Gwen Smith and Sadie Bartlett. The evidence was that Bowman administered and furnished narcotics to them. The instructions permitted the jury to find Bowman guilty of Counts IV, V, and VI for administering or furnishing narcotics when she was not accused of those offenses; and they permitted the jury to find Hixson guilty of administering or furnishing narcotics as an aider and abettor of Bowman when he was not charged with those offenses. The giving of these instructions was prejudicial error. (*People* v. *Pond,* 44 Cal.2d 665, 676 [284 P.2d 793].)

■ Dr. Hixson contends the court erred in refusing to give a number of instructions with respect to his good faith in issuing the prescriptions for Gwen Smith and Sadie Bartlett. The information specifically alleged that neither Gwen Smith nor Sadie Bartlett was a narcotic addict. Hixson proffered 10 instructions on the subject. We find no error in their refusal. One said in part:

"If you find from the evidence that Dr. Hixson in prescribing for Gwen Smith acted in good faith you must acquit him and Miss Bowman of count 4 of the information. If you find from the evidence that Dr. Hixson acted in good faith in prescribing for Sadie Bartlett you must acquit him and Miss Bowman of Counts 5 and 6 of the information. If you have a reasonable doubt as to whether he acted in good faith as to these prescriptions you must acquit him, and Miss Bowman of these counts."

Another read: "If from the evidence you believe that defendant Dr. W. C. Hixson, Jr., at the time and place charged in Count IV did prescribe demerol, a narcotic, for Mrs. Gwen Smith but believe that he did so in the regular practice of his profession of a Doctor of Medicine, or have a reasonable doubt as to whether he did so in the regular practice of his profes-

sion as a Doctor of Medicine, you must acquit him of the offense charged in Count IV."

A similar one was requested with respect to the prescriptions issued for Sadie Bartlett. Each instruction, as requested, was incomplete. Section 11162.5 of the Health and Safety Code provides that the responsibility for the proper prescribing and dispensing of narcotic drugs is on the practitioner. Section 11163 provides that except in the regular practice of his profession, no person shall prescribe a narcotic to or for any person who is not under his treatment for a pathology or condition other than narcotic addiction, except as otherwise provided. Section 11330 reads:

"A physician may prescribe for, furnish to, or administer narcotics to his patient when the patient is suffering from a disease, ailment, injury, or infirmities attendant upon old age, other than narcotic addiction.

"The physician shall prescribe, furnish, or administer narcotics only when in good faith he believes the disease, ailment, injury, or infirmity, requires such treatment.

"The physician shall prescribe, furnish, or administer narcotics only in such quantity and for such length of time as are reasonably necessary."

To have been proper, an instruction on the subject should have included all the requirements stated in the statutes. Further, the court gave the instruction set out in the margin.[7]

Defendants complain of the refusal to give numerous other instructions. We have examined them and find no error. Some were given as properly modified; others were covered by those given and were repetitive; others were incomplete; others had no application to the facts developed by the evidence; others were abstract or academic. We are satisfied that these other refused instructions were either erroneous and not justified by the issues or the evidence, or were covered by other and correct instructions.

Defendants assert the court erred in denying their motions to strike Counts II and III, the charges of grand theft, from the information. These charges were in the com-

[7] "'A physician may prescribe for, furnish to or administer narcotics to his patient when the patient is suffering from a disease, ailment, injury or infirmities attended upon old age, other than narcotic addiction.

"'The physician shall prescribe, furnish or administer narcotics only when in good faith he believes the disease, ailment, injury or infirmity requires such treatment, then physician shall prescribe, furnish or administer narcotics only in such quantity and for such length of time as are reasonably necessary.'"

plaint filed with the committing magistrate. At the preliminary examination he dismissed the charges and defendants were not committed therefor. Notwithstanding the dismissal, the district attorney included them in the information. Defendants' motions to strike them were denied. The jury found defendants guilty of grand theft as charged. The court granted defendants' motions for a new trial as to those counts In view of the possibility of a new trial as to the grand theft charges it is necessary to consider defendants' point The district attorney may file an information charging a different but related or connected offense shown by the evidence taken before the magistrate bearing on the transaction involved in the commitment order. He may not charge an offense in the information which is unrelated to or unconnected with the transaction which was the basis for the commitment order. (*Parks* v. *Superior Court,* 38 Cal.2d 609 [241 P.2d 521] ; *People* v. *Evans,* 39 Cal.2d 242, 249 [246 P.2d 636].) The charge of grand theft in Count II was that defendants unlawfully took $1,000 from Lois Earl, and that in Count III was that they unlawfully took $1,000 from Elizabeth Earl. Neither the testimony taken before the magistrate nor the commitment order is part of the record on appeal. Consequently we cannot say that the charges of grand theft in the information are unrelated to or unconnected with the transactions which were the basis of the commitment order On the record it cannot be held that the court erred in denying defendants' motions to strike Counts II and III from the information.

The errors noted were clearly prejudicial and compel a reversal. Other errors assigned are either not well taken or not likely to recur on a retrial.

The judgments and the orders denying a new trial are reversed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied February 11, 1958, and respondent's petition for a hearing by the Supreme Court was denied March 12, 1958. Shenk, J., and Spence, J., were of the opinion that the petition should be granted.