61 Cal.Rptr. 164]

[Crim. No. 5824.   First Dist., Div. Three.   June 16, 1967.]

THE PEOPLE, Plaintiff and Appellant, v. THOMAS S. TIERNEY et al., Defendants and Respondents.

(1)

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Derald E. Granberg, Deputy Attorney General, for Plaintiff and Appellant.

Robert J. Vars for Defendants and Respondents.

SALSMAN, J.—Thomas S. Tierney, Maxine Tierney and Donald Dean Davidson were indicted by the Grand Jury of Santa Clara County, and charged with conspiracy (Pen. Code, § 182) to violate Penal Code section 484 (petty theft), Penal Code section 311.5 (creation of advertising matter represented or held out to be obscene), and Business and Professions Code section 17500 (false and misleading advertising). Respondents moved to set aside the indictment pursuant to Penal Code section 995. The trial court granted their motion. The People appeal.

The transcript of evidence presented to the grand jury shows that five residents of Santa Clara County received through the mail an unsolicited brochure called the "Lupe Ramirez" brochure. It came in an envelope bearing the

inscription "*Special* for *EX*ecutives." The brochure offered for sale films, still photographs, playing cards and small illustrated comic books. Titles of some of the films were: "Two PEOPLE AND A BLANKET'—(One man and one woman)"; "'THEY REALLY GIVE HIM A WORKOUT'—(One man and two women)"; "'NO HOLDS BARRED'—(Two women)"; "'LUCKY DOG'—(A woman and her dog)"; "'THEY WORK UP A SWEAT'—(Two men)." Prices stated for the films were $25 for 100 feet of 8mm black and white movies, $35 for color films; $15 for a set of 25 stills from the movies, $25 for color; $15 for a deck of French type playing cards, "52 different positions"; $15 for 20 illustrated comic books.

The Lupe Ramirez brochure was called to the attention of the Santa Clara County District Attorney. He asked each of five persons who had received it to order some of the material described and each did so. All but one received the material ordered. The material was before the grand jury. The films have been transmitted to this court as an exhibit and we have viewed them. They may properly be described as innocuous, and we do not understand that the district attorney contended otherwise before the grand jury, or that the Attorney General contends otherwise before us.

The organization that prepared and mailed the Lupe Ramirez brochure and sent out the material was Consolidated Productions, Incorporated, a corporation, doing business as X Sales. The respondents were the incorporators of the corporation.

Respondent Thomas Tierney was president of Consolidated Productions, Incorporated. Respondent Davidson was vice-president. Maxine Tierney, in addition to being one of the incorporators, did office work and helped mail brochures. According to the record Thomas Tierney "ran the whole thing." Armand V. Garcia worked for the corporation, and appeared in some of the films. Tierney hired him . Later Garcia worked in the addressing department, where his duties were to mail out the Lupe Ramirez brochure, using telephone directories as his mailing lists. He worked under Tierney's direction and was instructed by Tierney to avoid schools, churches, hospitals and government agencies. Mailing proceeded at a high rate—ten to twenty thousand brochures per day.

Donald Schoof, a postal inspector, whose duty it was to keep obscene material out of the mail, questioned Tierney's operation. Schoof had questioned at least one prior operation

of Tierney's, and Tierney had thereafter closed out that venture. Schoof asked Tierney if the Lupe Ramirez brochure did not give the impression that he was selling obscene matter. Tierney replied that the only people who would assume that the matter he was selling was obscene were people with dirty minds, and that he couldn't help it if they assumed this and sent their money to him.

Garcia told the grand jury that the technique used in preparation of the brochure was called "scamming," by which is meant that written material is so prepared that ". . . people would tend to think they are getting something that they are not." He described the brochure as conveying the idea to its readers ". . . that there is some perverted or sexual-type subject."

Tierney's costs of production were: $2.00 for 200 feet of film; $100 per thousand for mailing the brochure, and $.50 to $.75 for a deck of playing cards.

Tierney's house and plant were searched by permission. The investigating officer found about $25,000 in cash and checks and about 1,000 unfilled orders for various materials described in the brochure.

■ Appellant contends that the trial court erred in dismissing the indictment, and we agree. In ruling upon the motion, the test the trial court was required to use is the familiar one noted in *People* v. *Aday,* 226 Cal.App.2d 520, 526 [38 Cal.Rptr. 199], namely whether the members of the grand jury, considering the evidence, and acting as men of ordinary caution and prudence, could be led to believe and conscientiously entertain a reasonable suspicion that the defendants were guilty of the offense charged. Our test at the appellate level is the same. (See also *People* v. *Nagle,* 25 Cal.2d 216, 222 [153 P.2d 344]; *Lorenson* v. *Superior Court,* 35 Cal.2d 49, 56 [216 P.2d 859]; *Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 183, 184 [281 P.2d 250].)

As we have noted, there was evidence that Schoof had investigated a prior operation conducted by Tierney and that after his investigation Tierney terminated the operation. Tierney's second enterprise was one conducted without the use of a sex lure, but because it quickly proved unprofitable, he gave it up. His next effort was the Lupe Ramirez brochure, which concerns us here.

All of the respondents knew of the contents of their brochure, since all participated in its preparation or distribution, or both. It offers, or at the very least appears to offer, material

of an obscene nature. Its preparation was carefully devised, and its calculated purpose was to lead the reader to believe that some perverted or sexual material would be supplied to those who placed their orders and sent in their money. But as we have said, the material supplied was innocuous.

All respondents had knowledge that the material furnished to those who ordered it did not fulfill the implied promises of the brochure, because all were engaged in the same project, namely, production, solicitation and supply.

Respondents contend that conspiracy is an offense requiring specific intent, and that no specific intent is shown by the evidence before the grand jury.

Specific intent is but one element in the crime of conspiracy. (1 Witkin, Cal. Crimes (1963) pp. 99-100.) Like other elements of the offense its presence, sufficient to support an indictment, need be established only by the test we have previously noted. Where, as here, there has been no direct admission or confession from which specific intent can be ascertained directly, its existence must be found in the circumstantial evidence. We think the circumstantial evidence in our record warrants the inference that respondents associated themselves together in a common scheme and design, for the purpose of extracting money from a known segment of the public by a false pretense, to offer for sale material described by them in such a manner as to create the belief it was obscene, and thereafter to deliver material that did not meet the implied promises of their brochure.

The grand jury could reasonably believe this scheme to be a fraud, and that respondents had agreed upon a course of conduct designed to violate the statutes against theft. Thus the indictment of all respondents for conspiracy to commit theft in violation of Penal Code section 484 is supported by the record.

Respondents argue, however, that no specific intent to violate Penal Code section 311.5 or Business and Professions Code section 17500 is shown and hence the conspiracy charge as to those offenses must fall. They say in effect that there is no showing that any of them knew of the existence of such statutes and hence they cannot be tried for conspiracy to violate them. They cite and rely upon *People* v. *Marsh,* 58 Cal.2d 732, 743 [26 Cal.Rptr. 300, 376 P.2d 300], and cases cited therein.

We cannot accept these contentions. The evidence we have related warrants the inference that all respondents knew that

what they were doing was wrong. They knew their brochure impliedly promised one thing and that they were delivering something less than that promised.

■ Although the mere doing of the act may not be sufficient to establish specific intent (*People* v. *Bowman,* 156 Cal. App.2d 784, 797 [320 P.2d 70] ; *People* v. *Maciel,* 71 Cal.App. 213 [234 P. 877]), nevertheless, the doing of the act, coupled with knowledge that the act done is unlawful, may be sufficient to establish specific intent, even though the persons charged may not have knowledge of the particular law violated. This principle is illustrated by *People* v. *Smith,* 63 Cal.2d 779, 793 [48 Cal.Rptr. 382, 409 P.2d 222], where the defendant entered a store for the purpose of cashing forged checks, and proof of specific intent to commit burglary (i.e., entry ''with intent to commit . . . any felony. . . .'') was thereby established. (Pen. Code, § 459.) The court dismissed defendant's claim that, in entering the store to cash a forged check he had no intent to commit burglary, by saying that defendant ''. . . admitted knowing it was unlawful to pass such forged checks; and whether or not he also knew which precise statute or code section he was violating when he entered the stores with this intent is . . . irrelevant. In short, the law recognizes honest purpose, not dishonest ignorance of the law, as a defense to a charge of committing a crime requiring 'specific intent.' '' (See also *People* v. *Marsh, supra,* 58 Cal.2d 732, 743 ; *People* v. *Bucchierre,* 57 Cal.App. 2d 153, 163 [134 P.2d 505].) Here there is evidence of the association of respondents for the purpose of committing theft by false pretenses. Their purpose was to bilk the public regardless of the law. It ill becomes them now to say that they did not know exactly what law or laws they were violating in their endeavors. We see sufficient evidence in the record to uphold the indictment of all respondents and conclude that it was error on the part of the trial court to dismiss.

The order dismissing the indictment is reversed.

Draper, P. J., and Brown (H.C.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 13, 1967.