Filed 6/7/16  P. v Avila CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>OMAR TORRES AVILA,<br><br>    Defendant and Appellant. | F069183<br><br>(Super. Ct. No. CF95538381)<br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan B. Conklin, Judge.

Alex Green, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Detjen, Acting P.J., Franson, J. and Smith, J.

# INTRODUCTION

The Three Strikes Reform Act of 2012 (Proposition 36) permits third strike offenders serving indeterminate life sentences for crimes that are not serious or violent to petition for resentencing. (Pen. Code, § 1170.126 et seq.)[1] If a petitioning offender satisfies the statute's eligibility criteria, they are resentenced as a second strike offender "unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).)

Following enactment of Proposition 36, Omar Torres Avila, who was serving an indeterminate life sentence as a third strike offender, filed a petition for resentencing. After a hearing on the matter, the superior court found Avila posed an unreasonable risk to public safety and denied the petition. On appeal, Avila contends (1) the superior court abused its discretion in denying his petition for resentencing, and (2) the definition of "unreasonable risk of danger to public safety" included in the Safe Neighborhoods and Schools Act (Proposition 47) applies to Proposition 36 as well. We affirm.

# STATEMENT OF FACTS

In 1995, Avila was convicted of possessing a weapon, a sharpened toothbrush, while in state prison, a violation of section 4502, subdivision (a). At sentencing, the trial court found Avila to have two prior strikes for residential burglary and assault with a deadly weapon causing great bodily injury and sentenced him as a third-strike offender to a term of 25 years to life in prison.

On November 26, 2012, the trial court received Avila's petition for recall of sentence pursuant to Proposition 36. On May 10, 2013, the superior court found Avila statutorily ineligible for resentencing because the controlling offense of possessing a sharp instrument while in state prison involved use of a deadly weapon.

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

Avila then filed a motion for reconsideration and brief regarding eligibility for resentencing. The superior court heard the motion for reconsideration July 12, 2013, found Avila was not statutorily excluded from submitting a petition, and reversed its previous ruling.

The hearing on Avila's petition for resentencing lasted eight days, beginning October 4, 2013, and concluding March 7, 2014. The People did not dispute Avila's statutory eligibility to be resentenced, but argued his release would pose an unreasonable risk to public safety, citing his continued gang membership. Defense argued the opposite, claiming Avila posed no such danger if released as he was not an active gang member. Several family members testified that they were prepared to support Avila in his future life in Mexico, where Avila hoped to reside when released.

Richard Subia, a 27-year veteran of the California Department of Corrections (CDCR), both as a correctional officer and director of the Department of Corrections, testified on Avila's behalf. Based on his review of Avila's "central file" and from speaking with Avila, Subia testified that when Avila first entered the CDCR, he affiliated himself with "Northern" Hispanic inmates, which was not "specifically a prison gang," but rather a regional or geographical group of inmates who "hang out" together for protection.

Subia explained that the "Northern Structure" is a prison gang which is a branch of the Nuestra Familia. According to Subia, while the CDCR validation process concluded Avila was associated with the Northern Structure gang based on confidential information from other validated gang members and items found in Avila's cell, validation did not necessitate any active behavior or violence on Avila's part to make that determination. Subia testified that, because Avila was validated, he was placed in the Security Housing Unit (SHU).

Subia explained that, in the past, the only way a validated gang member could get out of the SHU was by providing information (debriefing) on the prison gang the inmate

associated with. In the past 10 years, the process has been that a validated gang member in the SHU is reassessed every six years to determine if he is still active in the gang. More recently, the CDCR implemented a "step down process" whereby a SHU inmate who no longer wishes to be involved in the prison gang and has no disciplinary issues, can gain access to the general population without debriefing.

Subia opined that Avila's gang validation in 2008 was based on common materials, such as magazine covers with other gang members' names on them, a self-portrait Avila drew depicting himself with gang tattoos, his name in a street parolee's address book, and the "house rules" or "14 bonds" found in Avila's cell with his name on it. Subia explained each of these items had a non-gang-related component. Subia believed that, if the CDCR had utilized the more recent revised validation process, Avila would not have been labeled a validated gang member.

As for the sharpened toothbrush Avila had in his possession leading to his 1995 conviction and subsequent third strike sentence, Subia thought it not unusual because there were other Hispanic gangs in prison Avila would have to protect himself from. Subia noted Avila had received only one major rules infraction since 2010, which involved circumventing payment of restitution for another inmate.

Subia spoke to Avila, who said he was an East Side Redwood City gang member in 1992. According to Subia, Avila chose not to debrief while in the SHU because he was not a gang member and did not want to lie about other inmates' gang activities, which could get him in trouble and also endanger his family.

Based on Avila's criminal activity, prison record, and his statement, Subia concluded Avila would not pose an unreasonable risk of public safety in either Mexico or the United States, if released. Subia acknowledged he did not have access to Avila's confidential file in coming to this conclusion.

David White, the lead correctional officer on the fourth floor of the main jail where Avila was housed for three to four months while awaiting his resentencing hearing,

4.

testified Avila was a model inmate. White was not familiar with Avila's background at the CDCR.

Avila testified in his own behalf that he was 40 years old, born in Mexico, and came to the United States as a young child. He was the youngest of 14 children, with a working mother and absent father. He dropped out of school in the seventh grade and associated with the East Side Mada (ESM), a gang he described as a "car club" and not a validated criminal street gang. Avila did not consider himself a criminal street gang member.

After he turned 18, Avila was arrested for first degree burglary, beating up the individuals who stole his girlfriend's purse. He was armed with a knife at the time. Several days later, Avila was arrested for assault with a deadly weapon when he and his brother attacked some individuals who insulted his girlfriend. He cut three people with a machete during the assault; his brother shot someone with a gun. Avila explained he was drunk when he was arrested and claimed to be a member of the ESM in order to be left alone. Avila was sentenced to seven years in prison as part of a plea agreement.

When he arrived at San Quentin State Prison, Avila was classified as Northerner by the institution. He was housed with other Northerners and given a set or rules (bonds) to follow to stay out of trouble. After a while, he became connected with the gang because he wanted to be accepted by them. He got some gang tattoos to fit in, but did not get any new tattoos after 1993.

According to Avila, the sharpened toothbrush found in his cell in 1995 was used to trace patterns from magazines and he did not realize it was a rules violation. Avila admitted a number of disciplinary rule violations, including being in many mutual fights with other inmates. The violations included slashing someone across the face, assault and battery, and hitting an inmate in the face with his fist. Avila claimed all of the injuries occurred while defending himself.

Avila also received rule violations for making "pruno," for refusing to have his palm prints taken, and for refusing to get off the yard as a method to draw attention to another inmate not receiving his due process over a disputed matter.

Sometime in 1997 or 1998, after the Northerners staged a peaceful sit down over an issue involving toiletry supplies, Avila, who had acted as the spokesperson for the Northerners, was validated as a gang member and placed in the SHU. He has been there since.

In 2002, Avila was involved in a "spearing incident," in which he claimed another inmate thrust something into his cell. He was later found in possession of a small spear tip, which he did not contest. The next year he was disciplined for possessing a form of a sewing needle.

Avila claimed the 2008 self-portrait depicting gang tattoos was done to describe himself to a woman he was corresponding with and was kept in an art folder. He had the name and address of a new arrival validated gang member in his cell because he was supposed to "set up" the new inmate. Avila claimed the facility gave him the information.

Avila claimed he did not know it was a rule violation to have a validated gang member's name and address on a magazine he had traded. According to Avila, he lived by the "14 bonds" in order to survive. The last rule violation Avila received was in 2010 for "an incident involving an attempt to avoid restitution for another inmate."

Avila claimed not to know the parolee who possessed his name outside of prison in 2008. He also denied ever receiving a weapon while in prison. Avila did not know why his name was on a gang roster found in another inmate's cell in 2013. Avila denied writing on a jail classification questionnaire in 2013 that he was a Norteno; while he was a Northerner, he was not part of a gang.

Avila's gang status was reviewed twice a year, but when asked to debrief he declined because he was not a gang member and would not lie about other inmates and

6.

their gang activity. He declined to participate in the "step down" process in 2010 because it would have taken 15 years to complete.

Avila testified that, if released from prison, he would be deported to Mexico. He had a lot of family to support him and he would do any type of work, including tattooing.

The People called Special Agent Michael West, a 20-year employee with the CDCR, who testified as a gang expert that there were six certified gangs in the prison system, including the Northern Structure and Nuestra Familia. The Nuestra Familia orchestrated illegal activity from inside the prison using gang members of the Northern Structure. West described the Northern Structure as the "middle management" for Nuestra Familia.

West testified that in order to be validated as a prison gang member under the law, the inmate must have committed three separate crimes, one of which is directly linked to a current validated gang member or associate of that gang. Once validated, a gang member's status is reviewed every six years. If there is no new gang activity within that six-year period, the inmate is assessed to see if they are suitable for placement in the general population. Or the inmate may choose to go through a debriefing process. Each time Avila was asked to debrief, he said he was not a gang member and did not need to do so.

West reviewed Avila's central file and written statement to the court. Avila was originally validated in 1998 and found active in the Northern Structure in 2003 and 2008. Based on the information he reviewed, West believed Avila was an active or associate of the Northern Structure. West believed that any inmate would know having a magazine with a gang members' name on it or a copy of the "14 bonds" in one's cell could result in ramifications. West testified that Avila's possession of gang members' names and his self-portrait with tattoos were also indicative of gang membership. He opined Avila's involvement with circumventing another inmate's restitution in 2010 demonstrated a continued association with the Northern Structure. As did a 2013 confidential

7.

memorandum form indicating that Avila's name, CDC number, and numerous other Northern Structure members and associates names were discovered on a roster in the cell of a Northern Structure member.

Based on his review of the case and his experience and training, West believed Avila would pose an unreasonable risk to the safety of the public if released, as Avila had been in prison for 20 years and showed a progressive behavior toward gang activity and propensity toward violence even in the most restrictive setting during that time.

After the lengthy hearing on the matter, the trial court denied Avila's petition for resentencing, finding he posed an unreasonable risk to public safety if resentenced. In doing so, the superior court found Avila was a validated gang member. The superior court acknowledged Avila did not agree with that assessment and stated it understood Avila's reasons for not debriefing. As noted by the trial court, Avila had been in the SHU for such a lengthy time and "hasn't had the opportunity to do anything to show he would not be a danger." The trial court concluded by telling Avila this was "the longest hearing any of us have conducted on one of these parole cases. For good reason, because it was such a close call."

On March 14, 2014, Avila filed a motion for reconsideration of the trial court's denial of his petition for resentencing, which was subsequently denied March 28, 2014. The trial court ordered Avila transferred back to state prison for execution of sentence previously imposed. This appeal followed.

## DISCUSSION

### I. DID THE TRIAL COURT ERR BY DENYING AVILA'S PETITION FOR RESENTENCING?

Under Proposition 36, if a petitioning inmate meets the statutory eligibility requirements, "the petitioner shall be resentenced … unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.126, subd. (f).) In exercising its discretion, "the court may

8.

consider: [¶] (1) The petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes; [¶] (2) The petitioner's disciplinary record and record of rehabilitation while incarcerated; and [¶] (3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (§ 1170.126, subd. (g).)

We review a trial court's determination that an inmate poses an unreasonable risk of danger to public safety for an abuse of discretion. "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

In the instant case, the trial court's denial of Avila's petition for resentencing cited Avila's long held and continued gang validation. The evidence before the trial court included Avila's prison disciplinary record, which contained disciplinary actions for fights and being in possession of sharp instruments. Some of the infractions occurred when he was in the most restrictive housing in the SHU. There was also evidence of Avila's criminal history, which included residential burglary and assault with a deadly weapon, both times armed with a knife. Given this record, we simply cannot state the trial court's decision to deny Avila's petition was "so irrational that no reasonable person could agree with it." (*People v. Carmony, supra,* 33 Cal.4th at p. 377.) There was ample evidence to support the trial court's finding that Avila posed an unreasonable risk of danger to public safety and, accordingly, Avila is not entitled to relief.

## II.  DOES PROPOSITION 47'S DEFINITION OF "UNREASONABLE RISK OF DANGER TO PUBLIC SAFETY" APPLY TO AVILA'S PETITION?

On November 4, 2014, voters enacted Proposition 47. Under Proposition 47, certain offenses that were previously sentenced as felonies or "wobblers" were reduced to misdemeanors, and individuals serving felony sentences for those offenses were permitted to petition for resentencing. (§ 1170.18, subd. (a).) Assuming the petitioning

9.

inmate meets the statutory eligibility requirements, the trial court must resentence the inmate in accordance with Proposition 47 "unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (§ 1170.18, subd. (b).)

Unlike Proposition 36, Proposition 47 specifically defines "unreasonable risk of danger to public safety." That definition reads as follows: "As used throughout this Code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18, subd. (c).)

Section 667, subdivision (e)(2)(C)(iv) enumerates eight felonies or classes of felonies:

"The defendant suffered a prior serious and/or violent felony conviction, as defined in subdivision (d) of this section, for any of the following felonies:

"(I) A 'sexually violent offense' as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code.

"(II) Oral copulation with a child who is under 14 years of age, and who is more than 10 years younger than he or she as defined by Section 288a, sodomy with another person who is under 14 years of age and more than 10 years younger than he or she as defined by Section 286, or sexual penetration with another person who is under 14 years of age, and who is more than 10 years younger than he or she, as defined by Section 289.

"(III) A lewd or lascivious act involving a child under 14 years of age, in violation of Section 288.

"(IV) Any homicide offense, including any attempted homicide offense, defined in Sections 187 or 191.5, inclusive.

"(V) Solicitation to commit murder as defined in Section 653f.

"(VI) Assault with a machine gun on a peace officer or firefighter, as defined in paragraph (3) of subdivision (d) of Section 245.

10.

"(VII) Possession of a weapon of mass destruction, as defined in paragraph (1) of subdivision (a) of Section 11418.

"(VIII) Any serious and/or violent felony offense punishable in California by life imprisonment or death."

On appeal, Avila asserts that this definition of "unreasonable risk of danger to public safety" also applies to petitions for resentencing under Proposition 36. We disagree.[2]

"'""When statutory language is clear and unambiguous, there is no need for construction and courts should not indulge in it." [Citation.]' [Citation.]" (*People v. Hendrix* (1997) 16 Cal.4th 508, 512.) However, "the language of a statute should not be given a literal meaning if doing so would result in absurd consequences that the [voters] did not intend." (*In re Michele D.* (2002) 29 Cal.4th 600, 606.)

Here, it appears that the phrase "[a]s used throughout this Code," employed in section 1170.18, subdivision (c), refers to the entire Penal Code, not merely the provisions contained in Proposition 47. (See *People v. Bucchierre* (1943) 57 Cal.App.2d 153, 164-166; see also *Marshall v. Pasadena Unified School Dist.* (2004) 119 Cal.App.4th 1241, 1254-1255; *People v. Vasquez* (1992) 7 Cal.App.4th 763, 766.) We conclude, however, that such an interpretation would lead to consequences the voters did not intend when they enacted Proposition 47.

By its provision, Proposition 47 reduces the sentences of inmates serving felony sentences for specified offenses that are now classified as misdemeanors. Nowhere in the ballot materials on Proposition 47 were voters informed the law would also modify the resentencing provisions of Proposition 36, which concerns recidivist inmates serving sentences for felony offenses that remain classified as felonies.

---

[2] This issue is currently pending review by the California Supreme Court. (See *People v. Valencia*, review granted Feb. 18, 2015, S223825; *People v. Payne*, review granted Mar. 25, 2015, S223856.)

The official title and summary, legal analysis, and arguments for and against Proposition 47 are all silent on what effect, if any, Proposition 47 would have on Proposition 36. As we cannot conclude the voters intended an effect on which they were unaware, we decline to conclude the voters intended for Proposition 47's definition of "unreasonable risk of danger to public safety" to apply to section 1170.126, subdivision (f), of Proposition 36.

Further, while we are aware "[i]t is an established rule of statutory construction … that when statues are *in pari materia* similar phrases appearing in each should be given like meanings," we are not persuaded that Proposition 36 and 47 are in pari materia. (*People v. Caudillo* (1978) 21 Cal.3d 562, 585, overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 229, 237, fn. 6.) Two "[s]tatutes are considered to be in pari materia when they relate to the same person or thing, to the same class of person[s or] things, or have the same purpose or object." (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 124, fn. 4, quoting 2A Sutherland, Statutory Construction (Sands, 4th ed. 1984) § 51.03, p. 467.)

Proposition 47 deals with individuals sentenced as felons for crimes that are now misdemeanors, while Proposition 36 deals with inmates with at least two violent or serious felonies who are currently serving indeterminate life sentences for a third felony conviction. These laws deal with very different levels of punishment, and very different severity of offenses. Even if the statutes are in pari materia, however, canons of statutory instruction are not dispositive, and serve as "mere[] aids to ascertain probable legislative intent." (*Stone v. Superior Court* (1982) 31 Cal.3d 503, 521, fn. 10.) Given our review of Proposition 47, we conclude that voters intended the law to apply to the sentencing and resentencing of misdemeanor offenses enumerated within that law, and not to the previously enacted provisions of Proposition 36. Accordingly, Avila is not entitled to

remand that would subject his resentencing under Proposition 36 to the definition of "unreasonable risk of danger to public safety" contained in Proposition 47.[3]

## DISPOSITION

The order is affirmed.

---

[3] Avila also argues that if the definition of "unreasonable risk of danger to public safety" found in Proposition 47 applies to Proposition 36, then it must apply both retroactively and prospectively. As we find the definition found in Proposition 47 does not apply to Proposition 36, we need not address Avila's argument regarding retroactive and prospective application.